**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**

**Case No. 25-CV-_____**

| | |
|---|---|
| DOUG S. RIORDAN, | |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| VPC BUILDERS, LLC, | |
| Defendant. | |

## COMPLAINT AND REQUEST FOR DECLARATORY RELIEF

Plaintiff Douglas S. Riordan, ("Mr. Riordan" or "Plaintiff") complaining of the acts of Defendant VPC Builders, LLC ("VPC" or "Defendant"), files this civil action pursuant to Rule 57 of the Federal Rules of Civil Procedure and the Federal Declaratory Judgment Act, 28 U.S.C. ¶ 2201 *et seq.,* and in support of its complaint and request for declaratory judgment respectfully shows this Court as follows:

## PARTIES, JURISDICTION, and VENUE

1.      Plaintiff, Mr. Riordan, is currently a domicile of Florida. His primary residence and his business are located in Florida. Mr. Riordan is over the age of 18, is not on active military duty, and is otherwise *sui juris*. Plaintiff is a citizen of Florida for purposes of diversity jurisdiction.

2.      Defendant, VPC Builders, LLC, is a North Carolina limited liability company, duly organized and existing under the laws of the State of North Carolina

with its principal place of business in Banner Elk, Avery County, North Carolina. VPC is a citizen of North Carolina for purposes of diversity jurisdiction.

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) which confers original jurisdiction upon this Court in a civil action where, as here, the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

4. This Court has personal jurisdiction over the parties.

5. This Court has the authority to award the requested declaratory relief under 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57.

6. The Declaratory Judgment Act confers jurisdiction on this Court to:

> declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).

7. In actions seeking declaratory relief, the amount in controversy is measured by the "value of the object of the litigation[.]" *Pres. Forest LLC v. Nationwide Gen. Ins. Co.*, No. 3:19-CV-00634-DSC, 2020 U.S. Dist. LEXIS 9494, at *3 (W.D.N.C. Jan. 21, 2020) (citing and quoting *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 347, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977)). "The value of the object of the litigation is determined by 'the potential pecuniary effect that a judgment would have on either party to the litigation.'" *Id.* (citing and quoting *Lee v.*

*Citimortgage, Inc.,* 739 F. Supp. 2d 940, 946 (E.D. Va. 2010). "Under this test, the jurisdictional amount is satisfied if either the direct pecuniary value of the right that a plaintiff seeks to enforce or the cost of the defendant's compliance with the prospective equitable relief exceeds $ 75,000." *Id.* (internal quotations omitted).

8.      The amount in controversy in this case exceeds the sum of $75,000.

9.      Venue is appropriate in this District Court pursuant to 28 U.S.C. § 1391(b)(2) because all the events and omissions giving rise to the claims alleged below occurred in this District.

## INTRODUCTION

This action arises from two contracts entered between Douglas and Erin Riordan[1] and VPC Builders, LLC, including 1) a design contract for plans and specifications for the construction of a residence, and 2) a cost-plus construction contract. VPC is a design-build general contractor located in Banner Elk, North Carolina.

Mr. and Mrs. Riordan chose VPC to design and build a second home in the mountains of Western, North Carolina believing VPC to be a diligent, experienced, and competent general contractor. Despite a relatively straightforward project that should have been designed and completed within 2-3 years, VPC's design errors and lack of project coordination have caused substantial delays, increased costs, and

---

[1] Although Mrs. Riordan's name appears on the contracts, because of significant health issues including recent brain surgery, she is physically and mentally unable to participate in this case as a plaintiff. Her involvement in the underlying project, in any case, was minimal to non-existent.

damages. Additionally, VPC engaged in a pattern of improper and unsubstantiated billing. When Mr. Riordan questioned certain invoices of VPC's and requested supporting documentation, VPC stopped work, claiming it had the right to do so. Mr. Riordon, on the other hand, does not believe that VPC, having previously breached the contracts, was entitled to stop work and further delay the project.

## FACTUAL BACKGROUND

### *The Contracts*

10.     In or around April 2021, Mr. Riordan chose VPC to design and construct a two-story, single-family dwelling containing 5820 heated square feet located at 3916 Shulls Mills Road, Boone, Watauga County, North Carolina ("Project").

11.     Mr. Riordan hired VPC as his design-builder relying on VPC's reputation and expertise as a turnkey contractor in Western North Carolina.

12.     Mr. Riordan entered two contracts with VPC, (1) a design contract on or about June 7, 2021 ("Design Agreement"); and (2) a cost-plus construction contract ("Construction Agreement") on or about April 27, 2022. *See* **Exhibit A**.[2]

13.     Pursuant to the Design Agreement, VPC agreed to prepare a custom set of design plans to construct a house, with an initial estimate as stated in Paragraph 1 of the Design Agreement, as follows:

> VPC BUILDERS, LLC agrees to work with the Owner(s), VPC BUILDERS, LLC's design draftsmen, and other individuals to create a set of custom design plans for the intent of construction of a house as the parties may contract and agree to build at a later date. VPC BUILDERS, LLC agrees to assist the Owner(s) in the development and

[2] The parties also entered an interior design contract on or about August 22, 2022, but that contract is not the subject of this action.

preparation of a structure and agrees to consult with design rural, civil, structural, mechanical, electrical, or other systems as VPC BUILDERS, LLC deems needful or necessary.

14.    VPC prepared a construction set of final plans on or around August 12, 2022 ("Plans").

15.    Mr. Riordan paid VPC all amounts due under the Design Agreement with the understanding that the Plans VPC had completed were prepared by competent architects and were final, appropriate, and suitable for construction. VPC had taken an inordinate amount of time to complete the Plans and presented them to Plaintiff on August 22, 2022, as the "final" Plans.

16.    The Plans include drawings for a two-story slab on grade residential structure with approximately 5,500 heated square feet.

17.    On July 25, 2022, near the end of the Plan development, VPC estimated the value of construction at approximately $2,762,585, and the parties entered an Addendum to the Construction Contract containing this amount.

18.    The Construction Agreement contains a "time is of the essence" clause requiring Defendant to complete its construction work within specified deadlines after issuance of a building permit. It states:

> **Commencement & Substantial Completion** Work shall commence upon the obtainment of a building permit, or shortly thereafter. Construction time through substantial completion shall be fixed and is TBD months, not including delays and adjustments for delays caused by reason of holiday, inclement weather, accidents, labor or material shortages, additional time required for work performed pursuant change orders, or other

unavoidable delays or delays beyond the control of VPC
BUILDERS, LLC.

19.    Although the Construction Agreement contemplates a "fixed" construction deadline following issuance of the building permit and the agreement itself provides that the number of months is "TBD", the completion dates were later added by VPC to its scheduling software called "Buildertrend." At the time, the parties entered the Construction Agreement, VPC told Mr. Riordan it would take approximately eighteen (18) months, or until December 2023, to complete the construction work.

20.    The Construction Agreement also contains provisions requiring VPC to correct defective and non-conforming work at its own expense. The Construction Agreement states that the "Owner may reject work that does not conform to the Contract," and that the "Contractor shall promptly correct work rejected by the Owner as failing to conform to the requirements of the Contract," and that the "Contractor shall bear the costs of correcting such rejected work, including the costs of uncovering, replacement, and additional testing." Construction Agreement ¶20.

21.    The fact that VPC assumed the obligation and expense of correcting work including the costs of investigating and testing its work makes it implicit in the Construction Agreement that VPC also bore the concomitant responsibility to segregate its repair work from other non-repair work and to implement accounting control measures to properly track repairs, delays, and schedule acceleration costs.

*VPC's Poor Project Execution, Delays, and Overbilling*

22.     VPC obtained a building permit on September 9, 2022, but did not begin construction until February 2023.

23.     Beyond this months-long delay, Mr. Riordan began noticing many plan design and construction errors as the work progressed. Such mistakes and resulting delays were likely caused by VPC's frequent turnover in management personnel and lack of Project oversight, follow-through, and coordination. These errors were contributing to delays and increased construction costs

24.     As a result, the Project often languished with little work taking place.

25.     Examples of the design and construction errors that unnecessarily delayed the Project and increased costs include, but are not limited to: (a) design and construction defects related to the great room sliding door/window-wall; (b) delays associated with correcting the sliding door/window-wall; (c) design and construction defects relating to framing the interior staircase, and resulting delays; (d) the failure to structurally support the stick-built (*i.e.*, non-manufactured trusses) portion of the roof during construction; (e) Plan defects and knock-on impacts relating to the rear staircase; (f) installing the footers for the rear deck stairs in the wrong location; (g) design and construction defects relating to the dormer roofs (impacting the shed roof and dormer window); (h) the lack of engineered plans generally including in particular for the roof and jacuzzi, a violation of North Carolina's building code; (i) repeated turnover of key project management personnel; and (j) VPC's decision to stop work after breaching the contract in many ways including its significant delays.

26. VPC's accounting suffered from similar mismanagement and failure to undertake basic control measures. Among other things, VPC:

    a. Failed to implement the contractually required processes to segregate its repair and non-repair costs and the additional time necessary to perform repair work and resulting schedule acceleration needed from that work;

    b. Failed to account for construction delays;

    c. Failed to implement processes to track general conditions charges corresponding to repair work and periods of delay;

    d. Charged for all costs to repair defective work and for indirect labor and general conditions charges correlating to that work;

    e. Charged indirect labor, supervision, and general conditions for VPC's delays; and

    f. Improperly charged a builder's fee on certain invoices, such as interior design services.

27. Mr. Riordan attempted to address these concerns with VPC in verbal and written communications, but to no avail. By way of example only, attached are two emails dated April 26, 2024, and August 2, 2024, from Mr. Riordan to VPC. **See Exhibit B.**

28. On April 26, 2024, Mr. Riordan complained to Matt Vincent, the principal of VPC, regarding the sliding door/window-wall defects and the months-long delay in which the house was exposed to the elements.

29.     On August 2, 2024, Mr. Riordan pointed out the ongoing delays and the fact that VPC was well into the third year of its construction on the Project.

30.     Often when Mr. Riordan complained, as in these examples, VPC side-stepped accountability for its failures and shifted blame to Mr. Riordan for his supposedly unprofessional and inappropriate behavior towards employees and subcontractors, which was unfounded.

31.     Despite the challenges, Mr. Riordan still believed that VPC would act in good faith by accelerating the construction schedule and adhering to its contractual invoicing requirements.

32.     Four years into the Project, Mr. Riordan continued to pay VPC's invoices in full and in a timely manner.

33.     Nonetheless, VPC charged Mr. Riordan for all costs associated with repairing defective and non-conforming work, and insisted on payment from him, with the threat of stopping work if he refused to do so.

34.     One such example are the charges related to correcting the sliding door/window-wall. This defect was the direct result of Plan errors and VPC's unwillingness to accept responsibility for them. VPC created two so-called "change orders", referred to as Change Orders 22 and 32, to recover the costs of re-engineering and repairing the sliding door/window-wall for a total of $51,448, and then insisted on payment. To avoid VPC stopping work and scuttling the Project, Mr. Riordan paid these amounts under protest, while reserving his rights to dispute them later. *See* Ex. B (Aug. 2 email**)**; **Exhibit C** (Change Order #32).

35. Although VPC refused to acknowledge it, mistakes like these delayed the critical path for completion of the Project. All the while, VPC continued charging Riordan for its mistakes and "general conditions" charges with impunity. As later explained by VPC, general conditions charges included all supervisory and management labor.

***VPC Treats Completion Dates as a Moving Target***

36. VPC's original estimate for completing the Project was December 2023.

37. However, VPC was nowhere near completing its work by this time and changed the completion date on the construction schedule to June 2024.

38. The Project continued to experience more delays and VPC changed the completion date on Buildertrend again to reflect completion in January 2025. Distressed, Mr. Riordan requested a meeting with VPC in or around May 2024.

39. In the May 2024 meeting, VPC agreed to accelerate the construction schedule in exchange for Mr. Riordan's payment of Change Order 32, which work VPC had still not performed. As a result of this meeting, VPC agreed to complete construction by November 2024 and based on those assurances, Mr. Riordan released the disputed sliding door/window wall payment for Change Order 32 while reserving his right to dispute that payment in the future.

40. VPC fell short on its promises and two months after the May 2024 meeting, VPC made no demonstrative progress on the Project or the sliding door/window-wall.

Capua Law Firm, PA
10

41. After, VPC yet again unilaterally changed the completion date to cover for more of its delays. VPC, realizing that its failure to timely order cabinets would cause another 4-month delay, extended the completion date in Buildertrend by another four months.

42. Again, with VPC's typical hegemony, it sent another change order purporting to extend the schedule another 65 days from April 10, 2025, which would extend Mr. Riordan's completion date to June 2025.

***VPC's Mounting Costs, Unreasonable Delays, and No End in Sight to Overbilling***

43. VPC's work on this Project is now in its *fifth year*. The total cost to complete the Project will exceed approximately $5,000,000. Though approximately $1,900,000 of this increase is related to approved change orders, a large portion of the costs are not.

44. In addition to charging Mr. Riordan for costs to correct defective work, for every month that VPC has delayed the Project, it has invoiced Mr. Riordan approximately $15,000 in "general conditions" charges and indicated its intent to continuing doing so without regard for its mistakes, the schedule, or its delays.

45. VPC has implemented no discernible cost control measures to manage construction costs and failed to allocate its repairs costs or any indirect labor or general conditions expenses to any particular scope of work. Rather, despite its specific contractual obligations prohibiting it, VPC invoiced Mr. Riordan every dollar VPC has spent without regard for its mistakes or delays.

46.     VPC has also disregarded its contractual obligations by charging for fees that it had no right to charge.

47.     Despite obtaining a certificate of occupancy in May 2025, VPC has delayed completing the Project yet again by, among other things, failing to complete the master bath and kitchen cabinetry and failing to properly coordinate its work with the glass and cabinetry subcontractors.

### VPC Stops Work, Breaches Contract, and Termination

48.     In around April 2025, alarmed by VPC's unsupported and endless invoicing, Mr. Riordan began questioning some of VPC's invoices and general conditions charges. For example, in April 2025, VPC began sending Mr. Riordan invoices containing numerous unallocated general conditions charges as "change orders" without any explanation or backup documentation. Mr. Riordan questioned the invoices and requested an explanation and backup documentation. On or about June 30, 2025, before providing the information requested and while Mr. Riordan was still otherwise current on his account, VPC stopped work. Mr. Riordan disputed VPC's entitlement to stop work and notified VPC that it was in breach of the Construction Agreement. *See* **Exhibit D**.

49.     VPC improperly stopped work in a brinksmanship-style effort to force payment and financial concessions from Mr. Riordan at a time when VPC had already delayed the project by many months and when Mr. Riordan and his wife, who was seriously ill, were desperate.

50. On July 7, 2025, after VPC failed to cure, Mr. Riordan gave VPC a more comprehensive summary of VPC's breaches and implored VPC to reconsider its position and work through Mr. Riordan's legitimate questions and concerns. *See* **Exhibit E**.

51. VPC refused to do so.

52. On July 17, 2025, Mr. Riordan terminated all agreements with VPC for cause.

53. All necessary actions have been performed prior to the filing of this lawsuit.

## COUNT I – BREACH OF CONTRACT
### (The Design Agreement)

54. The allegations of the foregoing paragraphs are incorporated herein by reference.

55. The Design Agreement is a valid and binding agreement.

56. The Plaintiff has fully complied with all covenants, conditions, and obligations required of him under the Design Agreement.

57. The Design Agreement obligated VPC to prepare a set of construction set of plans that contained all the necessary engineering and structural elements for the Project.

58. The Design Agreement also contained an implied duty of good faith and fair dealing.

59. Plaintiff paid all VPC's design invoices in full because VPC had informed Plaintiff and Plaintiff believed that VPC had completed the design process by competent professionals including all the necessary engineering elements.

60. VPC breached the Design Agreement by, among other things,

    a. Failing to employ competent design professionals to prepare the Plans;

    b. failing to include the necessary and proper engineering elements in the Plans;

    c. unreasonably delaying the design process and beginning construction activities before completing the Plans;

    d. misrepresenting to Plaintiff that it had completed the Plans and was ready to start construction when the Plans were not ready for construction; and

    e. other ways learned during discovery and proven at trial.

61. As a result of VPC's breaches, the Project experienced delays and defective conditions as described in the paragraphs above.

62. As a direct and proximate result of VPC's actions, Plaintiff has been harmed in excess of $75,000 and other amounts to be fully determined at trial on the merits.

### COUNT II – BREACH OF IMPLIED DUTY THAT PLANS AND SPECIFICATIONS ARE ADEQUATE, ACCURATE AND COMPLETE
### (The Design Agreement)

63. The allegations of the foregoing paragraphs are incorporated herein by reference.

64. In every design contract, there is an implied duty that the plans and specifications are adequate, accurate and complete for the home on which the property is located.

65. VPC breached this duty because the final Plans it provided to Plaintiff were inaccurate and deficient in many ways, including the following:

    a. lacking essential engineering analysis and integration including, without limitation, related to the sliding door/window-wall and non-manufactured truss roof sections;

    b. contained errors and clashing related to the great room sliding door/ window wall;

    c. clashing and errors related to framing the interior staircase;

    d. improper design of the rear staircase;

    e. placement of the footers for the rear deck stairs in the wrong location;

    f. errors relating to the dormer roofs (impacting the shed roof and dormer window);

    g. lack of engineering for the jacuzzi; and

    h. all correlative delays and knock-on effects related to the above errors.

66. As a result of or in part due to the Plan errors, Defendant constructed defective work, created structural defects, significantly delayed the Project and caused damage to Plaintiff in an amount to be determined at trial.

## COUNT III – BREACH OF CONTRACT
### (The Construction Agreement)

67.     The allegations of the foregoing paragraphs are incorporated herein by reference.

68.     The Construction Agreement is a valid and binding agreement.

69.     Plaintiff has fully complied with all covenants, conditions, and obligations required of him under the Construction Agreement.

70.     As alleged in the paragraphs above and set forth in the Construction Agreement, VPC agreed that time was of the essence in completing the Project and meeting all deadlines provided in the construction schedule.

71.     The Construction Agreement also required VPC to correct its defective work at its own expense and to accelerate the schedule based on delays caused by its work.

72.     Implicit in the Construction Agreement is the obligation to staff the Project with enough qualified personnel including project managers and site superintendents.

73.     VPC breached the Construction Agreement by, among other things:

a.     Failing to obtain and maintain adequate project oversight, supervision, and coordination;

b.     Failing to properly supervise and coordinate the work of trades and subcontractors;

c.     Failing to identify plan errors and defects before starting work;

d.     Failing to execute the work in a reasonably diligent manner to meet the Project's schedule;

e.     Failing to repair its defective work on its own expense and to accelerate the schedule to recover for corresponding delays;

f.     Failing to implement cost control measures or accounting processes to comply with contractual requirements;

g.     Failing to adequately support invoices with backup documentation;

h.     Charging Plaintiff for costs to correct deficient work and for periods of delay; and

i.     other ways learned during discovery and proven at trial.

74.     Under the factual circumstances of this case, VPC also breached its implied duty of good faith and fair dealing.

75.     As alleged in the paragraphs above, VPC misrepresented certain facts to placate Plaintiff and receive payment without regard for the truth or accuracy of such assertions and mistreated Plaintiff in such a way that injured the rights of Plaintiff to receive the benefits of the Agreements and deprived Plaintiff of the fruits of its bargain with VPC.

76.     As a result of Defendant's actions, Plaintiff has been harmed in amounts to be fully determined at trial on the merits.

## COUNT IV – BREACH OF THE IMPLIED DUTY
## OF WORKMANLIKE PERFORMANCE
### (The Construction Agreement)

77.     The allegations of the foregoing paragraphs are incorporated herein by reference.

78.     At all times material hereto, Defendant has an implied duty to perform its work in a good and workmanlike manner.

79.     North Carolina law recognizes an implied warranty that the general contractor or builder will use the customary of skill and care on all projects.

80.     As alleged in the paragraphs above, VPC did not fulfill its duties to Plaintiff pertaining to industry standards and therefore breached the implied duty of workmanlike performance.

81.     In addition, because of VPC's decision to stop work, Plaintiff has not had the opportunity to obtain a final inspection of the dwelling and reserves the right to identify other conditions and defects and to retain necessary funds to remedy such defects, after obtaining a final inspection.

82.     As a direct and proximate result of this breach of the implied duty of workmanlike performance, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT V – DECLARATORY JUDGMENT

83.     The allegations of the foregoing paragraphs are incorporated herein by reference.

84. This declaratory judgment action is brought pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 & 2202 to declare the rights and obligations of the parties arising from a contract for construction of a private residence.

85. As set forth above, there exists, real and justiciable controversies between Plaintiff and Defendant regarding the parties' respective rights and obligations under the two (2) Agreements entered into by the parties.

86. Pursuant to 28 U.S.C. §§ 2201 & 2202, the Court can resolve the foregoing controversies through Declaratory Judgment.

87. Specifically, Plaintiff requests the court declare:

a. That Defendant VPC engaged in the first breach of the Design and Construction Agreements;

b. Had no right to stop work at the time and under the factual circumstances of this case; and

c. That Plaintiff at all relevant times had substantially complied with his obligations under the Agreements, which required VPC to honor its contractual obligations including complete construction.

## ATTORNEYS' FEES

Plaintiff seeks to recover reasonable attorneys' fees incurred in conjunction with this action under applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the court to grant it the following relief:

1.    Enter a judgment in favor of Plaintiff against Defendant under U.S.C. § 2201 declaring that Plaintiff is entitled to prevail on the rights and obligations stated above and that Defendant is entitled to no relief against Plaintiff;

2.    Enter a judgment in favor of Plaintiff and against Defendant on his claims of breach of contract, breach of the covenant of good faith and fair dealing, breach of implied duty that plans and specifications are adequate, accurate and complete, and breach of the implied duty of workmanlike performance;

3.    Award Plaintiff his actual, compensatory, consequential, and economic damages against Defendant in amounts to be determined at trial, plus prejudgment interest, costs and fees as may be properly awarded;

4.    Award reasonable attorneys' fees to Plaintiff under applicable law;

5.    Tax costs and fees against Defendant under applicable law;

6.    Trial by jury as to all issues; and

7.    For such other and further relief and the Court deems just and proper.

Capua Law Firm, PA

Respectfully submitted this the 24th day of July, 2025.

**s/Paul A. Capua**
Paul A. Capua / N.C. State Bar No. 40239
Natalia L. Talbot / N.C. State Bar No. 55328

*Attorneys for Plaintiff*
CAPUA LAW FIRM, PA
118 North Depot Street
Boone, NC 28607
Telephone: (828) 264-0260
Fax: (828) 378-0236
E-mail: paul@capualaw.com
E-mail: natalia@capualaw.com