**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

**Case No. 1:25-cv-00230**

| | |
|---|---|
| DOUGLAS S. RIORDAN,<br><br>Plaintiff,<br>v.<br><br>VPC BUILDERS, LLC;<br>TIMOTHY A. CHURCH d/b/a<br>TIMOTHY CHURCH MASONRY;<br>PRICE FRAMING AND<br>CONSTRUCTION, LLC;<br>WATAUGA VALLEY SERVICES,<br>LLC; A FLOORING OUTLET, INC.;<br>and ARETÉ ENGINEERS, PLLC,<br><br>Defendants. | **JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT AND REQUEST FOR DECLARATORY RELIEF**

Plaintiff Douglas S. Riordan, ("Mr. Riordan" or "Plaintiff") complaining of the acts of Defendant VPC Builders, LLC ("VPC"), Defendant Areté Engineers, PLLC ("Areté"), Defendant Timothy A. Church d/b/a Timothy Church Masonry ("Church"), Price Framing and Construction, LLC ("Price") Watauga Valley Services, LLC ("WVS") and A Flooring Outlet, Inc. ("AFO") (collectively, "Defendants"), files this civil action pursuant to Rule 57 of the Federal Rules of Civil Procedure and the Federal Declaratory Judgment Act,

28 U.S.C. § 2201 *et seq.,* and in support of its complaint and request for declaratory judgment respectfully shows this Court as follows:

**PARTIES, JURISDICTION, and VENUE**

1. Plaintiff, Douglas S. Riordan, is currently domiciled in Florida. His primary residence and his business are located in Florida. Mr. Riordan is over the age of 18, is not on active military duty, and is otherwise *sui juris*. Plaintiff is a citizen of Florida for purposes of diversity jurisdiction.

2. Defendant, VPC Builders, LLC, is a North Carolina limited liability company, duly organized and existing under the laws of the State of North Carolina with its principal place of business in Banner Elk, Avery County, North Carolina. Upon information and belief, Matthew T. Vincent is VPC Builders, LLC's sole member and is a citizen of North Carolina. Accordingly, VPC Builders, LLC is a citizen of North Carolina for purposes of diversity jurisdiction.

3. Defendant Areté Engineers, PLLC, is a North Carolina professional limited liability company with its principal place of business in Blowing Rock, Watauga County, North Carolina. Upon information and belief, Terry Shawn Ausel is Areté's sole member and is a citizen of North Carolina. Accordingly, Areté is a citizen of North Carolina for purposes of diversity jurisdiction. Areté was retained by VPC to provide structural engineering on

the project and, at all relevant times, acted as an engineer and design professional for the residence located at 3916 Shulls Mills Road, Boone, Watauga County, North Carolina.

4. Upon information and belief, Defendant Timothy A. Church is a citizen and resident of Trade, Johnson County, Tennessee and, at all relevant times, was doing business as Timothy Church Masonry with its principal place of business in Sugar Grove, Watauga County, North Carolina. Church was retained by VPC to provide stonework and masonry work on the project. Timothy A. Church is a citizen of Tennessee for purposes of diversity jurisdiction.

5. Upon information and belief, Price Framing and Construction, LLC is a limited liability company with its principal place of business in Laurinburg, Scotland County, North Carolina. Upon information and belief, Zackery Alan Price, Sr. is the sole member of Price Framing and Construction, LLC and is a citizen of North Carolina for purposes of diversity jurisdiction. Accordingly, Price Framing and Construction, LLC is a citizen of North Carolina for purposes of diversity jurisdiction. Price was retained by VPC to provide framing and siding installation on the project.

6. Upon information and belief, Watauga Valley Services, LLC, is a Tennessee limited liability company with its principal place of business in

Johnson City, Tennessee. Upon information and belief, Jared Blake Taylor is Watauga Valley Services, LLC's sole member and is a citizen of Tennessee. Accordingly, Watauga Valley Services, LLC, is a citizen of Tennessee for purposes of diversity jurisdiction. WVS was retained by VPC to provide labor and materials used to pour the concrete slab for the project.

7. Upon information and belief, A Flooring Outlet, Inc., is a North Carolina corporation, duly organized and existing under the laws of the State of North Carolina with its principal place of business in Banner Elk, North Carolina. Accordingly, A Flooring Outlet, Inc. is a citizen of North Carolina for purposes of diversity jurisdiction. AFO was retained by VPC to provide wood flooring installation on the project.

8. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1), which confers original jurisdiction where the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States. The amount in controversy exceeds $75,000. Complete diversity exists because Plaintiff is a citizen of Florida; VPC Builders, LLC, Price Framing and Construction, LLC, A Flooring Outlet, Inc., and Areté Engineers, PLLC are citizens of North Carolina; and Watauga Valley Services, LLC and Timothy Church are citizens of Tennessee.



Case 1:25-cv-00230-MR-WCM Document 5-1 Filed 07/28/25 Page 4 of 93 (overlapping stamps: Case 1:25-cv-00230-MR-WCM Document 4-6 Filed 07/23/25 Page 4 of 59)

9. This Court has the authority to award the requested declaratory relief under 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57.

10. This Court has personal jurisdiction over the parties. VPC, Price, AFO and Areté are North Carolina entities. Church regularly conducted business in North Carolina and performed masonry and stonework on the project in Watauga County, North Carolina. WVS regularly conducted business in North Carolina and performed concrete flooring work on the project in Watauga County, North Carolina. Each Defendant purposefully directed its work and services to North Carolina, and the claims alleged below arise from that work and those services.

11. The Declaratory Judgment Act confers jurisdiction on this Court to:

> declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.
>
> 28 U.S.C. § 2201(a).

12. The amount in controversy in this case exceeds the sum of $75,000.

13. Venue is appropriate in this District Court pursuant to 28 U.S.C. § 1391(b)(2) because all the events and omissions giving rise to the claims alleged below occurred in this District.

## INTRODUCTION

14. This action arises from two contracts entered between Douglas and Erin Riordan[1] and VPC Builders, LLC, including 1) a design contract for plans and specifications for the construction of a residence, and 2) a cost-plus construction contract. VPC was the design-builder for this project.

15. Mr. and Mrs. Riordan chose VPC to design and build a second home in the mountains of western North Carolina, believing VPC to be a diligent, experienced, and competent general contractor. Despite a relatively straightforward project that should have been designed and completed within 2-3 years, VPC's lack of project coordination or attention to detail caused construction defects, code violations, design errors, substantial delays, increased costs, and damage to completed work and Plaintiff's property. Additionally, VPC engaged in a pattern of improper and unsubstantiated billing. When Mr. Riordan questioned certain invoices of VPC's and requested supporting documentation, VPC stopped work, claiming it had the right to do so. Mr. Riordan, on the other hand, does not believe that VPC, having

[1] Although Mrs. Riordan's name appears on the contracts, because of significant health issues including recent brain surgery, she is physically and mentally unable to participate in this case as a plaintiff. Moreover, Mrs. Riordan executed an Assignment of Rights effective July 24, 2025, assigning all her right, title, and interest in the VPC design, construction, and interior-design contracts, including all related claims and rights of recovery, to Mr. Riordan. *See* **Exhibit F**. Her involvement in the underlying project, in any case, was minimal to non-existent.

previously breached the contracts, was entitled to stop work and further delay the project.

16. Since the filing of the original Complaint, Plaintiff's experts have completed additional investigation and analysis of the project. That investigation confirmed that this project contains significant construction defects, code violations, incomplete and non-conforming work, deficient structural design and coordination, defective masonry and stone veneer work, defective building-envelope interfaces, and subcontractor-caused physical injury to tangible components of the residence.

17. Among other subcontractors, VPC retained Areté to provide structural engineering services, retained Church to provide stonework and masonry work, retained Price to provide framing and siding installation, retained WVS for concrete slab installation and retained AFO for wood flooring installation. Areté, Church, Price, WVS and AFO failed to properly perform the work and services for which they were hired.

18. Defendants' substandard work caused resulting damage to and loss of use of completed work and Plaintiff's tangible property including completed wall assemblies, cladding, sheathing, structural framing, concrete slab and wood flooring, roof and deck assemblies, masonry and stone veneer

systems, window and door interfaces, finishes, and related building components.

19. Additionally, correcting the defective work and resulting damage will require the removal, demolition, deconstruction, reconstruction, and replacement of completed building components, including components that were not themselves defectively installed but must be removed or replaced to access and remediate the resulting damage.

## FACTUAL BACKGROUND

### *The Contracts*

20. In or around April 2021, Mr. Riordan chose VPC to design and construct a two-story, single-family dwelling containing 5820 heated square feet located at 3916 Shulls Mills Road, Boone, Watauga County, North Carolina ("Project").

21. Mr. Riordan hired VPC as his design-builder relying on VPC's reputation and expertise as a turnkey contractor in Western North Carolina.

22. Mr. Riordan entered two contracts with VPC, (1) a design contract on or about June 7, 2021 ("Design Agreement"); and (2) a cost-plus construction

contract ("Construction Agreement") on or about April 27, 2022. *See* **Exhibit A**.[2]

23. Pursuant to the Design Agreement, VPC agreed to prepare a custom set of design plans to construct a house, with an initial estimate as stated in Paragraph 1 of the Design Agreement, as follows:

> VPC BUILDERS, LLC agrees to work with the Owner(s), VPC BUILDERS, LLC's design draftsmen, and other individuals to create a set of custom design plans for the intent of construction of a house as the parties may contract and agree to build at a later date. VPC BUILDERS, LLC agrees to assist the Owner(s) in the development and preparation of a structure and agrees to consult with design rural, civil, structural, mechanical, electrical, or other systems as VPC BUILDERS, LLC deems needful or necessary.

24. VPC prepared a construction set of final plans on or around August 12, 2022 ("Plans").

25. Mr. Riordan paid VPC all amounts due under the Design Agreement with the understanding that the Plans VPC had completed were prepared by competent architects and were final, appropriate, and suitable for construction. VPC had taken an inordinate amount of time to complete the Plans and presented them to Plaintiff on August 22, 2022, as the "final" Plans.

26. The Plans include drawings for a two-story slab on grade residential structure with approximately 5,500 heated square feet.

---

[2] The parties also entered an interior design contract on or about August 22, 2022, but that contract is not the subject of this action.

27. On July 25, 2022, near the end of the Plan development, VPC estimated the value of construction at approximately $2,762,585, and the parties entered an Addendum to the Construction Contract containing this amount.

28. The Construction Agreement contains a "time is of the essence" clause requiring Defendant to complete its construction work within specified deadlines after issuance of a building permit. It states:

> **Commencement & Substantial Completion** Work shall commence upon the obtainment of a building permit, or shortly thereafter. Construction time through substantial completion shall be fixed and is TBD months, not including delays and adjustments for delays caused by reason of holiday, inclement weather, accidents, labor or material shortages, additional time required for work performed pursuant change orders, or other unavoidable delays or delays beyond the control of VPC BUILDERS, LLC.

29. Although the Construction Agreement contemplates a "fixed" construction deadline following issuance of the building permit and the agreement itself provides that the number of months is "TBD", the completion dates were later added by VPC to its scheduling software called "Buildertrend." At the time, the parties entered the Construction Agreement, VPC told Mr. Riordan it would take approximately eighteen (18) months, or until December 2023, to complete the construction work.

30. The Construction Agreement also contains provisions requiring VPC to correct defective and non-conforming work at its own expense. The Construction Agreement states that the "Owner may reject work that does not conform to the Contract," and that the "Contractor shall promptly correct work rejected by the Owner as failing to conform to the requirements of the Contract," and that the "Contractor shall bear the costs of correcting such rejected work, including the costs of uncovering, replacement, and additional testing." Construction Agreement ¶20.

31. The fact that VPC assumed the obligation and expense of correcting work including the costs of investigating and testing its work makes it implicit in the Construction Agreement that VPC also bore the concomitant responsibility to segregate its repair work from other non-repair work and to implement accounting control measures to properly track repairs, delays, and schedule acceleration costs.

***VPC's Poor Project Execution, Delays, Defects, and Overbilling***

32. VPC obtained a building permit on September 9, 2022, broke ground on October 6, 2022, and but did not pour footers until February 6, 2023.

33. Beyond this month's long delay, Mr. Riordan began noticing many plan design and construction errors as the work progressed. Such mistakes and resulting delays were likely caused by VPC's frequent turnover in management

personnel and lack of Project oversight, follow-through, and coordination. These errors were contributing to delays and increased construction costs

34. As a result, the Project often languished with little work taking place.

35. Examples of the design and construction errors that unnecessarily delayed the Project and increased costs include, but are not limited to: (a) design and construction defects related to the great room sliding door/window-wall; (b) delays associated with correcting the sliding door/window-wall; (c) design and construction defects relating to framing the interior staircase, and resulting delays; (d) the failure to structurally support the stick-built (*i.e.*, non-manufactured trusses) portion of the roof during construction; (e) Plan defects and knock-on impacts relating to the rear staircase; (f) installing the footers for the rear deck stairs in the wrong location; (g) design and construction defects relating to the dormer roofs (impacting the shed roof and dormer window); (h) the lack of engineered plans generally including in particular for the roof and jacuzzi, a violation of North Carolina's building code; (i) repeated turnover of key project management personnel; and (j) VPC's decision to stop work after breaching the contract in many ways including its significant delays.



Case 1:25-cv-00230-MR-WCM Document 5-1 Filed 07/28/25 Page 12 of 93

36. Design and construction defects were later confirmed and expanded through further investigation and assessment of the Project by experts. Those experts confirmed that the Project contained significant structural, code, building-envelope, masonry, flashing, waterproofing, framing, concrete slab, flooring and cladding defects, as well as resulting physical damage and repair scopes requiring removal and replacement of completed work and other property.

37. VPC's accounting suffered from similar mismanagement and failure to undertake basic control measures. Among other things, VPC:

a. Failed to implement the contractually required processes to segregate its repair and non-repair costs and the additional time necessary to perform repair work and resulting schedule acceleration needed from that work;

b. Failed to account for construction delays;

c. Failed to implement processes to track general conditions charges corresponding to repair work and periods of delay;

d. Charged for all costs to repair defective work and for indirect labor and general conditions charges correlating to that work;

e. Charged indirect labor, supervision, and general conditions for VPC's delays; and

f. Improperly charged a builder's fee on certain invoices, such as interior design services.

38. Mr. Riordan attempted to address these concerns with VPC in verbal and written communications, but to no avail. By way of example only, attached are two emails dated April 26, 2024, and August 2, 2024, from Mr. Riordan to VPC. **See <u>Exhibit B</u>.**

39. On April 26, 2024, Mr. Riordan complained to Matt Vincent, the principal of VPC, regarding the sliding door/window-wall defects and the months-long delay in which the house was exposed to the elements.

40. On August 2, 2024, Mr. Riordan pointed out the ongoing delays and the fact that VPC was well into the third year of its construction on the Project.

41. Often when Mr. Riordan complained, as in these examples, VPC side-stepped accountability for its failures and shifted blame to Mr. Riordan for his supposedly unprofessional and inappropriate behavior towards employees and subcontractors, which was unfounded.

42. Despite the challenges, Mr. Riordan still believed that VPC would act in good faith by accelerating the construction schedule and adhering to its contractual invoicing requirements.



Case 1:25-cv-00230-MR-WCM Document 5-1 Filed 07/28/25 Page 14 of 93

43. Four years into the Project, Mr. Riordan continued to pay VPC's invoices in full and in a timely manner.

44. Nonetheless, VPC charged Mr. Riordan for all costs associated with repairing defective and non-conforming work, and insisted on payment from him, with the threat of stopping work if he refused to do so.

45. One such example is the charges related to correcting the sliding door/window-wall. This defect was the direct result of Plan errors and VPC's unwillingness to accept responsibility for them. VPC created two so-called "change orders", referred to as Change Orders 22 and 32, to recover the costs of re-engineering and repairing the sliding door/window-wall for a total of $51,448, and then insisted on payment. To avoid VPC stopping work and scuttling the Project, Mr. Riordan paid these amounts under protest, while reserving his rights to dispute them later. *See* Ex. B (Aug. 2 email); **Exhibit C** (Change Order #32).

46. Although VPC refused to acknowledge it, mistakes like these delayed the critical path for completion of the Project. All the while, VPC continued charging Riordan for its mistakes and "general conditions" charges with impunity. As later explained by VPC, general conditions charges included all supervisory and management labor.

### *VPC Treats Completion Dates as a Moving Target*

47. VPC's original estimate for completing the Project was December 2023.

48. However, VPC was nowhere near completing its work by this time and changed the completion date on the construction schedule to June 2024.

49. The Project continued to experience more delays and VPC changed the completion date on Buildertrend again to reflect completion in January 2025. Distressed, Mr. Riordan requested a meeting with VPC in or around May 2024.

50. In the May 2024 meeting, VPC agreed to accelerate the construction schedule in exchange for Mr. Riordan's payment of Change Order 32, which work VPC had still not performed. As a result of this meeting, VPC agreed to complete construction by November 2024 and based on those assurances, Mr. Riordan released the disputed sliding door/window wall payment for Change Order 32 while reserving his right to dispute that payment in the future.

51. VPC fell short on its promises and two months after the May 2024 meeting, VPC made no demonstrative progress on the Project or the sliding door/window-wall.

52. After, VPC yet again unilaterally changed the completion date to cover for more of its delays. VPC, realizing that its failure to timely order cabinets would cause another 4-month delay, extended the completion date in Buildertrend by another four months.

53. Again, with VPC's typical hegemony, it sent another change order purporting to extend the schedule another 65 days from April 10, 2025, which would extend Mr. Riordan's completion date to June 2025.

***VPC's Mounting Costs, Unreasonable Delays, and No End in Sight to Overbilling***

54. VPC's work on this Project is now in its *fifth year*. The total cost to complete the Project will exceed approximately $5,000,000. Though approximately $1,900,000 of this increase is related to approved change orders, a large portion of the costs are not.

55. In addition to charging Mr. Riordan for costs to correct defective work, for every month that VPC has delayed the Project, it has invoiced Mr. Riordan approximately $15,000 in "general conditions" charges and indicated its intent to continue doing so without regard for its mistakes, the schedule, or its delays.

56. VPC has implemented no discernible cost control measures to manage construction costs and failed to allocate its repair costs or any indirect labor or general conditions expenses to any particular scope of work. Rather,

despite its specific contractual obligations prohibiting it, VPC invoiced Mr. Riordan every dollar VPC has spent without regard for its mistakes or delays.

57. VPC has also disregarded its contractual obligations by charging for fees that it had no right to charge.

58. Despite obtaining a certificate of occupancy in May 2025, VPC has delayed completing the Project yet again by, among other things, failing to complete the master bath and kitchen cabinetry and failing to properly coordinate its work with the glass and cabinetry subcontractors.

***VPC Stops Work, Breaches Contract, and Termination***

59. In or around April 2025, alarmed by VPC's unsupported and endless invoicing, Mr. Riordan began questioning some of VPC's invoices and general conditions charges. For example, in April 2025, VPC began sending Mr. Riordan invoices containing numerous unallocated general conditions charges as "change orders" without any explanation or backup documentation. Mr. Riordan questioned the invoices and requested an explanation and backup documentation. On or about June 30, 2025, before providing the information requested and while Mr. Riordan was still otherwise current on his account, VPC stopped work. Mr. Riordan disputed VPC's entitlement to stop work and notified VPC that it was in breach of the Construction Agreement. *See* **Exhibit D**.

60. VPC improperly stopped work in a brinksmanship-style effort to force payment and financial concessions from Mr. Riordan at a time when VPC had already delayed the project by many months and when Mr. Riordan and his wife, who was seriously ill, were desperate.

61. On July 7, 2025, after VPC failed to cure, Mr. Riordan gave VPC a more comprehensive summary of VPC's breaches and implored VPC to reconsider its position and work through Mr. Riordan's legitimate questions and concerns. *See* **Exhibit E**.

62. VPC refused to do so.

63. On July 17, 2025, Mr. Riordan terminated all agreements with VPC for cause and later retained other contractors and experts to complete and assess the work in place.

***The Work Deviates from the Contract Requirements, is Defective, Violates the Building Code, and Contains Design Defects***

64. After VPC abandoned the Project, Plaintiff's experts completed further investigation and analysis of Defendants' work. Those materials confirmed additional defects and damages that were not fully known when the original Complaint was filed.

65. VPC performed or caused to be performed substantial portions of the work through subcontractors, such as framing and siding, roofing, exterior cladding, stone veneer and masonry, flashing and waterproofing, window and



Case 1:25-cv-00230-MR-WCM Document 54-1 Filed 07/28/26 Page 19 of 93

door installation, deck construction, insulation, concrete work, flooring, structural design, and related scopes of work.

66. At all times relevant, VPC was responsible for coordinating and supervising the work of its subcontractors and for ensuring that the Project was constructed in accordance with the Contracts, Plans, applicable building codes, manufacturer requirements, industry standards, and good and workmanlike construction practices.

67. VPC retained Areté to provide structural engineering for the Project. Areté's work included, or should have included, the preparation, review, coordination, and approval of structural engineering plans, calculations, details, load paths, point loads, foundation and framing requirements, deck and roof support requirements, and related structural components necessary for a code-compliant residence.

68. Church was retained by VPC to provide stonework and masonry on the Project. Church's work included, or should have included, stone veneer and masonry work performed in compliance with the Plans, applicable building codes, manufacturer requirements, industry standards, required clearances, flashing, weep screeds, WRB integration, drainage requirements, and good and workmanlike construction practices.

69. Price was retained by VPC to provide framing and siding installation on the Project including natural wood siding, bark shingles, and related exterior wall cladding work.

70. WVS was retained by VPC to install the basement concrete slab-on-ground that served as the substrate for the floor covering.

71. AFO was retained by VPC to prep the concrete slab and install the wood floor covering including grinding the slab, installing the floors with ram board, and cutting around tiles and changing out boards.

72. The defects identified by Plaintiff's experts include, without limitation, structural design and load-path defects; inadequate or incomplete engineering; uneven and unlevel basement slab; flooring defects; roof and attic framing defects; defective ridge beam; lateral load, point load, deck joist, deck girder, built-up column, LVL, hanger, taper-cut, and fireblocking defects; sliding window-wall design and construction defects; defective window and door sealant and flashing defects; defective WRB integration; defective exterior cladding and siding; defective stone veneer and masonry work; defective deck attachment and waterproofing; and other defects to be proven through discovery and at trial.

73. VPC did not complete construction of the Project in accordance with the construction documents and did not complete construction in

accordance with applicable building codes, manufacturer requirements, and industry standards.

74. VPC constructed the Project using construction documents prepared under VPC's arrangement with Areté that did not provide the information required to satisfy the 2018 North Carolina Residential Code. Components that did not meet criteria for code-based prescriptive design were constructed without adequate engineered design shown in the construction documents.

75. These structural conditions caused damage to completed work and Plaintiff's tangible property and will require extensive engineering, re-engineering, demolition, reconstruction, and further investigation of structural and non-structural components. The defects also caused loss of use of portions of the residence.

76. The sliding window-wall defect is one example. The sliding window-wall framing at the rear elevation could not be constructed as indicated on the construction documents because it clashed with a structural post. To address this conflict, the wall and related framing were deconstructed, relocated, built out, reconstructed, and re-engineered, causing additional costs, delays, removal and replacement of completed components, and damage to other parts of the Project.



Case 1:25-cv-00230-MR-WCM Document 54-1 Filed 07/28/26 Page 22 of 93

77. Similarly, VPC's improper flashing around the deck bands requires removal and reconstruction of deck components and loss of use of the deck. Inspection of the rear elevation second-floor deck attachment found that the wall covering waterproofing components did not continue behind the deck band board to create a continuous water management system in accordance with applicable building codes and industry standards. Adjacent sections of WRB above and below the deck band were discontinuous and were not weather-lapped; aluminum flashing behind the deck band was not weather-lapped with the WRB as required by applicable codes; the flashing did not kick out below the band; aluminum flashing was used in violation of applicable deck-construction requirements; and the flashing did not extend two inches above the bottom of the siding.

78. The stone veneer and masonry work performed by Church, or by others under VPC's supervision, contained missing or inadequate clearances above earth, paving, horizontal flashing, and other surfaces; missing or inadequate weep screeds; missing or defective WRB integration; missing or defective flashing; and masonry and stone veneer conditions that created building-envelope intersections susceptible to water intrusion, trapped moisture, deterioration, and damage to adjacent building components.

79. Price performed framing and siding work on the Project that is defective including construction of the interior and exterior stairs, decking, roof gables, dormers, foyer gable, flashing around windows, and ridge-to-beam supports.

80. Price also installed the natural wood siding and cladding without nailing strips or blocking required by the applicable building codes, and without observed nailing strips or blocking. In addition, the natural wood siding and bark shingles above horizontal flashing were installed without the clearance required by applicable building codes and industry standards.

81. The above siding, flashing, masonry, and building-envelope defects caused, or created pathways for, water intrusion behind cladding into wall assemblies, premature deterioration, damage to sheathing, and other building components, and resulting loss of use of affected portions of the residence.

82. WVS was hired to pour the basement concrete slab-on-ground that would serve as the substrate for the floor covering. The concrete slab was poured with excessive variations in elevation, exceeding the maximum allowances permitted under the applicable standards. As a result, the slab failed to comply with applicable standards and caused the completed floor assembly to fail to meet the requirements of the applicable building code.

83. AFO installed the wood flooring over the concrete slab despite its excessive undulations, thereby causing the floor to “give” when walked on and compounding the existing defects and contributing to the finished floor's noncompliance with applicable standards and the need for further corrective work.

84. Plaintiff seeks damages including the costs to investigate, test, engineer, remediate, repair, replace, remove, demolish, reconstruct, and complete the Project; costs to repair resulting property damage; costs to remove and replace completed components necessary to access and repair damaged or defective assemblies; loss-of-use damages; delay damages; general conditions and carrying costs caused by Defendants’ acts and omissions; overpayments; and other actual, consequential, compensatory, and economic damages to be proven at trial.

85. Defendants’ acts and omissions described above caused damages in excess of $75,000 and in amounts to be determined at trial

86. All necessary actions have been performed prior to the filing of this lawsuit.

********

**COUNT I – BREACH OF CONTRACT**
**(The Design Agreement – Against VPC)**

87. The allegations of the foregoing paragraphs are incorporated herein by reference.

88. The Design Agreement is a valid and binding agreement.

89. The Plaintiff has fully complied with all covenants, conditions, and obligations required of him under the Design Agreement.

90. The Design Agreement obligated VPC to prepare a set of construction set of plans that contained all the necessary engineering and structural elements for the Project.

91. The Design Agreement also contained an implied duty of good faith and fair dealing.

92. Plaintiff paid all VPC's design invoices in full because VPC had informed Plaintiff and Plaintiff believed that VPC had completed the design process by competent professionals including all the necessary engineering elements.

93. VPC breached the Design Agreement by, among other things,

a. Failing to employ competent design professionals to prepare the Plans;

b. failing to include the necessary and proper engineering elements in the Plans;

c. failing to coordinate Areté's structural engineering work with the architectural, structural, and construction requirements of the Project;

d. failing to ensure that the Plans, structural drawings, and engineering details provided sufficient load paths, point loads, foundation support, lateral load design, roof and deck structural design, and other engineering necessary for code-compliant construction;

e. unreasonably delaying the design process and beginning construction activities before completing the Plans;

f. misrepresenting to Plaintiff that it had completed the Plans and was ready to start construction when the Plans were not ready for construction; and

g. other ways learned during discovery and proven at trial.

94. As a result of VPC's breaches, the Project experienced delays and defective conditions as described in the paragraphs above.

95. As a direct and proximate result of VPC's breaches, Plaintiff also sustained damage to tangible property and resulting loss of use as alleged above, including damage caused by defective design coordination and subcontractor work to completed building components and other property.

96. As a direct and proximate result of VPC's actions, Plaintiff has been harmed in excess of $75,000 and other amounts to be fully determined at trial on the merits.

**<u>COUNT II – BREACH OF IMPLIED DUTY THAT PLANS AND SPECIFICATIONS ARE ADEQUATE, ACCURATE AND COMPLETE (The Design Agreement – Against VPC)</u>**

97. The allegations of the foregoing paragraphs are incorporated herein by reference.

98. In every design contract, there is an implied duty that the plans and specifications are adequate, accurate and complete for the home on which the property is located.

99. VPC breached this duty because the final Plans it provided to Plaintiff were inaccurate and deficient in many ways, including the following:

a. lacking essential engineering analysis and integration including, without limitation, related to the sliding door/window-wall and non-manufactured truss roof sections;

b. contained errors and clashing related to the great room sliding door/ window wall;

c. clashing and errors related to framing the interior staircase;

d. improper design of the rear staircase;



Case 1:25-cv-00230-MR-WCM Document 24-1 Filed 09/30/25 Page 28 of 93

e. placement of the footers for the rear deck stairs in the wrong location;

f. errors relating to the dormer roofs (impacting the shed roof and dormer window);

g. lack of engineering for the jacuzzi;

h. failure to provide adequate structural load paths, point loads, ridge beam design, lateral load design, deck design, roof support, foundation coordination, and other structural requirements necessary to satisfy the 2018 North Carolina Residential Code and applicable standards;

i. failure to coordinate Areté's limited structural drawings with the final Plans and with the as-built construction;

j. failure to provide details sufficient to prevent defective, non-code-compliant, and damaging construction by VPC and its subcontractors; and

k. all correlative delays and knock-on effects related to the above errors.

100. As a result of or in part due to the Plan errors, Defendant constructed defective work, created structural defects, significantly delayed the Project and caused damage to Plaintiff in an amount to be determined at trial.



Case 1:25-cv-00230-MR-WCM Document 5-1 Filed 07/28/25 Page 29 of 93

101. The damages caused by VPC's breach include the cost to investigate, engineer, remediate, repair, remove, replace, and reconstruct defective and damaged work, resulting property damage to completed building components, and loss of use of portions of the residence.

**<u>COUNT III – BREACH OF CONTRACT</u>**
**<u>(The Construction Agreement – Against VPC)</u>**

102. The allegations of the foregoing paragraphs are incorporated herein by reference.

103. The Construction Agreement is a valid and binding agreement.

104. Plaintiff has fully complied with all covenants, conditions, and obligations required of him under the Construction Agreement.

105. As alleged in the paragraphs above and set forth in the Construction Agreement, VPC agreed that time was of the essence in completing the Project and meeting all deadlines provided in the construction schedule.

106. The Construction Agreement also required VPC to correct its defective work at its own expense and to accelerate the schedule based on delays caused by its work.

107. Implicit in the Construction Agreement is the obligation to (1) staff the Project with enough qualified personnel including project managers and site superintendents, and (2) retain, coordinate, supervise, and control



Case 1:25-cv-00230-MR-WCM Document 54-1 Filed 07/23/26 Page 30 of 93

competent subcontractors and design professionals, and to ensure that their work complied with the Plans, applicable codes, manufacturer requirements, industry standards, and good and workmanlike construction practices.

108. VPC breached the Construction Agreement by, among other things:

a. Failing to obtain and maintain adequate project oversight, supervision, and coordination;

b. Failing to properly supervise and coordinate the work of trades and subcontractors;

c. Failing to identify plan errors and defects before starting work;

d. Failing to execute the work in a reasonably diligent manner to meet the Project's schedule;

e. Failing to repair its defective work on its own expense and to accelerate the schedule to recover for corresponding delays;

f. Failing to implement cost control measures or accounting processes to comply with contractual requirements;

g. Failing to adequately support invoices with backup documentation;



Ccaassee 11:2255-ccvv-0002330-MMRR-WWCCMM Ddooccuummeenntt 5241 FFiilleedd 0079/2380/2256 PPaaggee 3311 ooff 5993

h. Charging Plaintiff for costs to correct deficient work and for periods of delay;

i. Failing to construct the Project in accordance with the Construction Agreement, Plans, applicable building codes, manufacturer requirements, and industry standards;

j. Failing to coordinate and supervise Areté, Church, Price, WVS, AFO and other subcontractors and trade contractors;

k. Failing to prevent defective subcontractor and trade work from causing damage to the completed work of others and to Plaintiff's property, and resulting loss of use;

l. Failing to correct or pay for resulting property damage caused by defective work and subcontractor work; and

m. other ways learned during discovery and proven at trial.

109. Under the factual circumstances of this case, VPC also breached its implied duty of good faith and fair dealing.

110. As alleged in the paragraphs above, VPC misrepresented certain facts to placate Plaintiff and receive payment without regard for the truth or accuracy of such assertions and mistreated Plaintiff in such a way that injured the rights of Plaintiff to receive the benefits of the Agreements and deprived Plaintiff of the fruits of its bargain with VPC.

111. As a result of Defendant's actions, Plaintiff has been harmed in amounts to be fully determined at trial on the merits.

**<u>COUNT IV – BREACH OF THE IMPLIED DUTY</u>**
**<u>OF WORKMANLIKE PERFORMANCE</u>**
**<u>(The Construction Agreement – Against VPC)</u>**

112. The allegations of the foregoing paragraphs are incorporated herein by reference.

113. At all times material hereto, Defendant has an implied duty to perform its work in a good and workmanlike manner.

114. North Carolina law recognizes an implied warranty that the general contractor or builder will use the customary level of skill and care on all projects.

115. As alleged in the paragraphs above, VPC did not fulfill its duties to Plaintiff pertaining to industry standards and therefore breached the implied duty of workmanlike performance.

116. VPC also breached the implied duty of workmanlike performance by allowing defective and non-code-compliant structural, framing, deck, roof, siding, flashing, waterproofing, masonry, and other building-envelope work to be installed and remain at the Project.

117. VPC's defective work and its subcontractors' defective work is causing damage to Plaintiff's property, including wall assemblies, cladding,



Case 1:25-cv-00230-MR-WCM Document 54-1 Filed 07/28/26 Page 33 of 93

sheathing, framing, roof and deck assemblies, stone veneer systems, finishes, and related components, and resulting loss of use.

118. In addition, because of VPC's decision to stop work, Plaintiff has not had the opportunity to obtain a final inspection of the dwelling and reserves the right to identify other conditions and defects and to retain necessary funds to remedy such defects, after obtaining a final inspection.

119. As a direct and proximate result of this breach of the implied duty of workmanlike performance, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT V – DECLARATORY JUDGMENT (Against VPC)

120. The allegations of the foregoing paragraphs are incorporated herein by reference.

121. This declaratory judgment action is brought pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 & 2202 to declare the rights and obligations of the parties arising from a contract for construction of a private residence.

122. As set forth above, there exists, real and justiciable controversies between Plaintiff and Defendant regarding the parties' respective rights and obligations under the two (2) Agreements entered into by the parties.

123. Pursuant to 28 U.S.C. §§ 2201 & 2202, the Court can resolve the foregoing controversies through Declaratory Judgment.

124. Specifically, Plaintiff requests the court declare:

a. That Defendant VPC engaged in the first breach of the Design and Construction Agreements;

b. Had no right to stop work at the time and under the factual circumstances of this case; and

c. That Plaintiff at all relevant times had substantially complied with his obligations under the Agreements, which required VPC to honor its contractual obligations including complete construction.

**<u>COUNT VI – NEGLIGENCE</u>**
**<u>(Against Church)</u>**

125. The allegations of the foregoing paragraphs are incorporated herein by reference.

126. At all times material hereto, Church was engaged in the business of providing stonework and masonry services for compensation and held himself out as competent to perform such work on residential construction projects in North Carolina.

127. Church owed Plaintiff a duty, independent of any contract between Church and VPC, to perform his stonework and masonry work in a reasonably safe, competent, non-negligent, and workmanlike manner and in compliance

with applicable building codes, manufacturer requirements, industry standards, the Plans, and good construction practices.

128. Church knew or should have known that his stonework and masonry work would be incorporated into Plaintiff's residence and that defective, non-code-compliant, or improperly integrated stonework and masonry would cause or contribute to physical injury to the residence, including wall assemblies, cladding, sheathing, framing, flashing, WRB components, finishes, and other tangible property.

129. Church breached his duties by, among other things:

a. Failing to perform stonework and masonry work in a good and workmanlike manner;

b. Failing to comply with applicable building codes, manufacturer requirements, industry standards, and the Plans;

c. Failing to provide required clearances for adhered stone veneer and masonry above earth, paving, decks, roofs, horizontal flashing, and other surfaces;

d. Failing to properly install, coordinate, or integrate flashing, WRB, drainage components, and weep screeds with the stone veneer and masonry work;

e. Failing to prevent masonry and stone veneer work from creating building-envelope intersections susceptible to water intrusion, trapped moisture, premature deterioration, and damage to adjacent building components;

f. Failing to coordinate his work with VPC and other trades to ensure a continuous water-management system;

g. Failing to correct defective or non-conforming stonework and masonry after the defects existed or should have been known; and

h. Such other and further acts of negligence as shall be shown in discovery or at trial.

130. Church's negligence caused or contributed to physical injury to tangible property, including exterior wall assemblies, cladding, sheathing, framing, flashing, WRB components, finishes, and related components of the residence.

131. Church's negligence also caused resulting loss of use and required or will require investigation, removal, demolition, reconstruction, repair, replacement, and remediation of defective and damaged components, including completed components not themselves defectively installed but necessarily removed or damaged to access and correct the resulting damage.

132. As a direct and proximate result of Church's negligence, Plaintiff has been damaged in an amount to be determined at trial, but in excess of $75,000.

**COUNT VII – BREACH OF THE IMPLIED DUTY OF WORKMANLIKE PERFORMANCE**
**(Against Church)**

133. The allegations of the foregoing paragraphs are incorporated herein by reference.

134. At all times material hereto, Church had an implied duty to perform his stonework and masonry work in a good and workmanlike manner.

135. North Carolina law recognizes an implied warranty that contractors and subcontractors performing construction work will use the customary level of skill and care required for that work.

136. Church breached the implied duty of workmanlike performance by failing to perform stonework and masonry work in accordance with the customary skill and care required of masonry and stone veneer contractors, applicable building codes, manufacturer requirements, industry standards, the Plans, and good construction practices.

137. Church's breach includes, without limitation, defective or non-code-compliant stone veneer clearances, flashing, weep screeds, WRB integration, drainage, masonry interfaces, and related work as alleged above.

138. As a direct and proximate result of Church's breach of the implied duty of workmanlike performance, Plaintiff sustained physical injury to tangible property, resulting loss of use, investigation and repair costs, removal and replacement costs, delay damages, and other damages to be determined at trial.

## COUNT VIII – NEGLIGENCE
## (Against Price)

139. The allegations of the foregoing paragraphs are incorporated herein by reference.

140. At all times material hereto, Price was engaged in the business of framing and installing siding and cladding for compensation and held itself out as competent to perform such work on residential construction projects in North Carolina.

141. Price owed Plaintiff a duty, independent of any contract between Church and VPC, to perform its framing and siding and exterior cladding work in a reasonably safe, competent, non-negligent, and workmanlike manner and in compliance with applicable building codes, manufacturer requirements, industry standards, the Plans, and good construction practices.

142. Price knew or should have known that its framing work would be incorporated into Plaintiff's residence and that defective, non-code-compliant, or improperly constructed framing would cause or contribute to structural

deficiencies, water intrusion, misalignment of building components, damage to other portions of the residence, diminution in value, and the need for substantial corrective and repair work.

143. Price knew or should have known that its siding and exterior cladding work would be incorporated into Plaintiff's residence and that defective, non-code-compliant, or improperly integrated siding and cladding would cause or contribute to building-envelope defects and damage or risk of damage to the residence, including wall assemblies, cladding, sheathing, framing, flashing, WRB components, finishes, and other tangible property.

144. Price breached its duties by, among other things:

a. Failing to perform all framing work in a good and workmanlike manner;

b. Failing to perform siding and cladding work in a good and workmanlike manner;

c. Failing to comply with applicable building codes, manufacturer requirements, industry standards, and the Plans;

d. Failing to install natural wood siding with required nailing strips or blocking;

e. Failing to install wood exterior wall cladding, including natural wood siding and bark shingles, with required clearances over horizontal flashing;

f. Failing to install siding and exterior cladding work in a manner that maintained required building-envelope drainage and water-management performance;

g. Failing to prevent siding and cladding work from creating building-envelope intersections susceptible to failure, water intrusion, and premature deterioration; and

h. Such other and further acts of negligence as shall be shown in discovery or at trial

145. Price's negligence caused or contributed to physical injury to tangible property, including exterior wall assemblies, cladding, sheathing, framing, flashing, WRB components, finishes, and related components of the residence.

146. Price's negligence caused or contributed to the need for further investigation and remediation of framing, siding, cladding, flashing interfaces, and affected wall assemblies, together with resulting loss of use, repair costs, removal and replacement costs, and other damages to be determined at trial.

147. As a direct and proximate result of Price's negligence, Plaintiff has been damaged in an amount to be determined at trial, but in excess of $75,000.

## COUNT IX – BREACH OF THE IMPLIED DUTY OF WORKMANLIKE PERFORMANCE (Against Price)

148. The allegations of the foregoing paragraphs are incorporated herein by reference.

149. At all times material hereto, Price had an implied duty to perform its framing, siding and cladding work in a good and workmanlike manner.

150. North Carolina law recognizes an implied warranty that contractors and subcontractors performing construction work will use the customary level of skill and care required for that work.

151. Price breached the implied duty of workmanlike performance by failing to perform framing and siding and cladding installation services in accordance with the customary skill and care required of masonry and stone veneer contractors, applicable building codes, manufacturer requirements, industry standards, the Plans, and good construction practices.

152. Price's breach includes, without limitation, defective or non-code-compliant framing work, installation of natural wood siding without required nailing strips or blocking and installation of natural wood siding and bark

shingles above horizontal flashing without required clearances, among other things.

153. As a direct and proximate result of Price's breach of the implied duty of workmanlike performance, Plaintiff sustained physical injury to tangible property, resulting loss of use, investigation and repair costs, removal and replacement costs, delay damages, and other damages to be determined at trial.

**COUNT X – NEGLIGENCE**
**(Against Watauga Valley Services)**

154. The allegations of the foregoing paragraphs are incorporated herein by reference.

155. At all times material herein, WVS was engaged in the business of providing concrete installation, slab construction, and related construction services for compensation and held itself out as competent to perform such work on residential construction projects in North Carolina.

156. WVS was retained by VPC to provide labor and materials used to pour and install the basement concrete slab-on-ground for the Project.

157. WVS owed Plaintiff a duty, independent of any contract between WVS and VPC, to perform its concrete slab work in a reasonably safe, competent, non-negligent, and workmanlike manner and in compliance with

applicable building codes, industry standards, ACI standards, the Plans, specifications, and good construction practices.

158. WVS knew or should have known that its concrete slab work would be incorporated into Plaintiff's residence and would serve as the substrate for finished flooring and other completed building components, and that defective, uneven, unlevel, improperly sloped, non-code-compliant and improperly constructed concrete slab work would cause or contribute to physical injury to the residence, including the finished wood flooring, floor assemblies, finishes, and related tangible property.

159. WVS breached its duties by, among other things:

a. Failing to perform concrete slab work in a good and workmanlike manner;

b. Failing to install the concrete slab in compliance with applicable building codes, ACI standards, industry standards, the Plans, specifications, and good construction practices;

c. Failing to install the concrete slab within applicable tolerances for slope, flatness, and levelness;

d. Installing, constructing, and/or leaving in place a concrete slab with elevation variations and localized undulations exceeding applicable ACI standards and the allowable slope tolerances for the Project;



Case 1:25-cv-00230-MR-WCM Document 5-1 Filed 07/28/25 Page 44 of 93
Case 1:25-cv-00230-MR-WCM Document 24-1 Filed 09/28/26 Page 44 of 59

e. Failing to identify, correct, grind, level, remediate, or otherwise address the defective, uneven, unlevel, and improperly sloped concrete slab before subsequent trades installed finished flooring over the slab;

f. Failing to coordinate its work with VPC and other trades to ensure that the concrete slab was suitable to receive finished wood flooring; and

g. Such other and further acts of negligence as shall be shown in discovery or at trial.

160. WVS's negligence caused or contributed to physical injury to tangible property, including the finished wood flooring, floor coverings, the house framing in the basement and upper levels, finishes, and other related building components of the residence.

161. WVS's negligence also caused resulting loss of use and required or will require investigation, removal, demolition, grinding, leveling, reconstruction, repair, replacement, and remediation of defective and damaged components, including completed components not themselves defectively installed but necessarily removed or damaged to access and correct the resulting damage.

162. As a direct and proximate result of WVS's negligence, Plaintiff has been damaged in an amount to be determined at trial, but in excess of $75,000.

**COUNT XI – BREACH OF THE IMPLIED DUTY OF WORKMANLIKE PERFORMANCE**
**(Against Watauga Valley Services)**

163. The allegations of the foregoing paragraphs are incorporated herein by reference.

164. At all times material herein, WVS had an implied duty to pour the concrete slab work in a good and workmanlike manner.

165. North Carolina law recognizes an implied warranty that contractors and subcontractors performing construction work will use the customary level of skill and care required for that work.

166. WVS breached the implied duty of workmanlike performance by failing to install the concrete slab in accordance with the customary skill and care required of concrete contractors, applicable building codes, ACI standards, industry standards, the Plans, specifications, and good construction practices.

167. WVS's breach includes, without limitation, defective, uneven, unlevel, improperly sloped, non-code-compliant, and nonconforming concrete slab work, including elevation variations and localized undulations exceeding applicable ACI standards and allowable slope tolerances, among other things.

168. As a direct and proximate result of WVS's breach of the implied duty of workmanlike performance, Plaintiff sustained physical injury to tangible property, resulting loss of use, investigation and repair costs, removal

and replacement costs, delay damages, and other damages to be determined at trial.

**<u>COUNT XII – NEGLIGENCE</u>**
**<u>(Against A Flooring Outlet)</u>**

169. The allegations of the foregoing paragraphs are incorporated herein by reference.

170. At all times material herein, AFO was engaged in the business of supplying and installing wood flooring and related flooring materials for compensation and held itself out as competent to perform such work on residential construction projects in North Carolina.

171. AFO was retained by VPC to provide wood flooring installation on the Project, including installation of Middleton Spanish Moss flooring, floor preparation, cleaning and covering, supplying ram board, tape, additional Spanish Moss flooring, Spanish Moss t-molding, stairnose materials, and related labor.

172. AFO owed Plaintiff a duty, independent of any contract between AFO and VPC, to perform its flooring work in a reasonable, competent, non-negligent, and workmanlike manner and in compliance with applicable building codes, manufacturer requirements, industry standards, the Plans, specifications, and good construction practices.

173. AFO knew or should have known that its wood flooring work would be incorporated into Plaintiff's residence and that defective, improperly installed, insecure, loose, nonconforming, or non-code-compliant flooring work would cause or contribute to physical injury to the residence, including the finished wood flooring, floor coverings, floor assemblies, finishes, and related tangible property.

174. AFO further knew or should have known that finished wood flooring should not be installed over an unsuitable, uneven, unlevel, improperly sloped, or nonconforming concrete slab without appropriate investigation, preparation, leveling, remediation, correction, and/or notice to VPC and Plaintiff.

175. AFO breached its duties by, among other things:

a. Failing to perform wood flooring installation in a good and workmanlike manner;

b. Failing to comply with applicable building codes, manufacturer requirements, industry standards, the Plans, specifications, and good construction practices;

c. Installing wood flooring over a concrete slab that was uneven, unlevel, improperly sloped, and/or otherwise unsuitable to receive finished flooring;

d. Failing to properly inspect, test, verify, or confirm that the concrete slab was suitable to receive the wood flooring before installation;

e. Failing to adequately grind, level, prepare, remediate, or otherwise address the slab conditions before installing the wood flooring;

f. Installing wood flooring in a manner that resulted in insecure, loose, uneven, and/or nonconforming floor covering conditions;

g. Failing to warn VPC and Plaintiff that the concrete slab conditions were unsuitable for finished wood flooring installation; and

h. Such other and further acts of negligence as shall be shown in discovery or at trial.

176. AFO's negligence caused or contributed to physical injury to tangible property, including the finished wood flooring, floor coverings, floor assemblies, finishes, and related building components of the Project.

177. AFO's negligence also caused resulting loss of use and required or will require investigation, removal, demolition, reconstruction, repair, replacement, and remediation of defective and damaged components, including completed components not themselves defectively installed but necessarily removed or damaged to access and correct the resulting damage.

178. As a direct and proximate result of AFO's negligence, Plaintiff has been damaged in an amount to be determined at trial, but in excess of $75,000.

## COUNT XIII – BREACH OF THE IMPLIED DUTY OF WORKMANLIKE PERFORMANCE
## (Against A Flooring Outlet, Inc.)

179. The allegations of the foregoing paragraphs are incorporated herein by reference.

180. At all times material hereto, AFO had an implied duty to perform its wood flooring installation work in a good and workmanlike manner.

181. North Carolina law recognizes an implied warranty that contractors and subcontractors performing construction work will use the customary level of skill and care required for that work.

182. AFO breached the implied duty of workmanlike performance by failing to perform its wood flooring installation and related flooring services in accordance with the customary skill and care required of flooring contractors, applicable building codes, manufacturer requirements, industry standards, the Plans, specifications, and good construction practices.

183. AFO's breach includes, without limitation, installing wood flooring over an unsuitable, uneven, unlevel, improperly sloped, and/or nonconforming concrete slab; failing to properly inspect, prepare, grind, level, remediate, or otherwise address the substrate before installation; and installing wood flooring in a defective, insecure, loose, uneven, and nonconforming manner, among other things.

184. As a direct and proximate result of AFO's breach of the implied duty of workmanlike performance, Plaintiff sustained physical injury to tangible property, resulting loss of use, investigation and repair costs, removal and replacement costs, delay damages, and other damages to be determined at trial.

## **COUNT XIV – NEGLIGENCE**
## **(Against Areté Engineers)**

185. The allegations of the foregoing paragraphs are incorporated herein by reference.

186. At all times material hereto, Areté was engaged in the business of providing professional engineering services for compensation and was retained by VPC to provide structural engineering for the Project.

187. Areté owed Plaintiff a duty to exercise the degree of care, skill, and diligence ordinarily exercised by engineers engaged in similar professional practice under similar circumstances.

188. Areté knew or should have known that its structural engineering work would be used to construct Plaintiff's residence and that Plaintiff, VPC, subcontractors, trades, building officials, and others would rely on Areté's drawings, calculations, details, markups, approvals, and engineering decisions.

189. Areté's duties included, without limitation, the duty to provide adequate, accurate, complete, coordinated, and code-compliant structural engineering sufficient to permit construction of the residence in accordance with the 2018 North Carolina Residential Code, applicable professional standards, and the applicable standard of care.

190. Areté breached its duties by, among other things:

a. Failing to provide adequate structural engineering for the Project;

b. Failing to provide a sufficient load path in accordance with applicable codes and standards;

c. Failing to adequately design or detail ridge beams, lateral load support, point loads, foundation and framing support, roof framing, deck structures, and other structural components;

d. Failing to provide adequate calculations, drawings, specifications, details, and coordination for structural components that did not satisfy prescriptive design requirements;

e. Failing to identify and correct conflicts between the Plans, structural drawings, shop drawings, field conditions, and as-built construction;

f. Failing to provide adequate engineering for the sliding window-wall and related structural components;

g. Failing to exercise reasonable care in reviewing, revising, marking up, approving, or coordinating structural drawings and field conditions;

h. Failing to warn Plaintiff, VPC, or others that the Plans and structural drawings were inadequate, incomplete, inaccurate, or not ready for construction; and

i. Such other and further acts of negligence and professional negligence as shall be shown in discovery or at trial.

191. Areté's negligence caused or contributed to defective and non-code-compliant construction, unknown or inadequate structural capacity, defective load paths, defective framing, defective roof and deck assemblies, and the need for substantial structural analysis, redesign, remediation, removal, reconstruction, repair, and replacement.

192. Areté's negligence caused or contributed to physical injury to tangible property, including structural framing, roof assemblies, deck assemblies, wall assemblies, cladding, sheathing, finishes, and related building components, and caused resulting loss of use of portions of the residence.

193. As a direct and proximate result of Areté's negligence, Plaintiff has been damaged in an amount to be determined at trial, but in excess of $75,000.

**<u>COUNT XV – BREACH OF THE IMPLIED DUTY THAT THE PLANS ARE ADEQUATE, ACCURATE AND COMPLETE</u>**
**<u>(Against Areté Engineers)</u>**

194. The allegations of the foregoing paragraphs are incorporated herein by reference.

195. Areté undertook to provide engineering plans, drawings, calculations, details, markups, approvals, and related structural engineering services for the Project.

196. Areté owed an implied duty that the engineering plans, drawings, calculations, details, and specifications it prepared, revised, reviewed, approved, or provided for the Project were adequate, accurate, and complete for the residence being constructed.

197. Areté breached this implied duty by, among other things:

a. Failing to provide structural drawings and engineering sufficient to satisfy applicable code requirements;

b. Failing to provide adequate load-path, point-load, lateral-load, roof, ridge beam, deck, foundation, and framing design;

c. Failing to provide adequate and coordinated engineering for structural conditions that did not satisfy prescriptive design requirements;



Case 1:25-cv-00230-MR-WCM Document 54-1 Filed 07/28/26 Page 54 of 93

d. Failing to provide plans and details sufficient for VPC and its subcontractors to construct the Project in a code-compliant and workmanlike manner;

e. Failing to identify and correct conflicts, omissions, and deficiencies in the Plans and structural drawings;

f. Failing to provide adequate plans and engineering for the sliding window-wall and other structural components; and

g. Such other and further breaches as shall be shown in discovery or at trial.

198. As a result of Areté's breach, the Project was constructed with defective, inadequate, incomplete, or non-code-compliant structural components and required substantial investigation, analysis, redesign, remediation, repair, removal, replacement, and reconstruction.

199. As a direct and proximate result of Areté's breach of the implied duty that the plans are adequate, accurate and complete, Plaintiff has been damaged in an amount to be determined at trial

**ATTORNEYS' FEES**

Plaintiff seeks to recover reasonable attorneys' fees incurred in conjunction with this action under applicable law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays the court to grant it the following relief:

1. Enter a judgment in favor of Plaintiff against Defendant, VPC under 28 U.S.C. § 2201 declaring that Plaintiff is entitled to prevail on the rights and obligations stated above and that VPC is entitled to no relief against Plaintiff;

2. Enter a judgment in favor of Plaintiff and against Defendant, VPC on his claims of breach of contract, breach of the covenant of good faith and fair dealing, breach of implied duty that plans and specifications are adequate, accurate and complete, and breach of the implied duty of workmanlike performance;

3. Enter a judgment in favor of Plaintiff and against Defendant Church on Plaintiff's claims for negligence and breach of the implied duty of workmanlike performance;

4. Enter a judgment in favor of Plaintiff and against Defendant WVS on Plaintiff's claims for negligence and breach of the implied duty of workmanlike performance;

5. Enter a judgment in favor of Plaintiff and against Defendant AFO on Plaintiff's claims for negligence and breach of the implied duty of workmanlike performance;

6. Enter a judgment in favor of Plaintiff and against Defendant Areté Engineers on Plaintiff's claims for negligence and breach of the implied duty that the plans are adequate, accurate and complete

7. Award Plaintiff his actual, compensatory, consequential, economic, and punitive damages against Defendants, jointly and severally as appropriate, in amounts to be determined at trial, plus prejudgment interest, costs and fees as may be properly awarded;

8. Award Plaintiff damages for investigation, testing, engineering, remediation, repair, replacement, demolition, removal, reconstruction, completion, resulting property damage, loss of use, delay, general conditions, carrying costs, overpayments, and other damages to be proven at trial.

9. Award reasonable attorneys' fees to Plaintiff under applicable law;

10. Tax costs and fees against Defendants under applicable law;

11. Trial by jury as to all issues; and

12. For such other and further relief and the Court deems just and proper.

Respectfully submitted this the 28th day of July, 2026.

**s/ Paul A. Capua**
Paul A. Capua / N.C. State Bar No. 40239
*Attorney for Plaintiff*
CAPUA LAW FIRM, PA
118 North Depot Street
Boone, NC 28607
Telephone: (828) 264-0260
Fax: (828) 378-0236
E-mail: paul@capualaw.com

## CERTIFICATE OF SERVICE

The undersigned, being an attorney duly licensed to practice law in the State of North Carolina and the Western District of North Carolina, does hereby certify that the **FIRST AMENDED COMPLAINT AND REQUEST FOR DECLARATORY RELIEF** was served via CM/ECF to the following:

Nathan Miller
MILLER & JOHNSON, PLLC
756 W King St,
Boone, NC 28607
nathan@millerandjohnsonlaw.com
*Attorneys for Defendant, VPC*

Paul Culpepper
YOUG MORPHIS, et al.
PO Drawer 2428
Hickory, NC 28603
paulc@hickorylaw.com
*Attorneys for Defendant, VPC*

This the 28th day of July, 2026.

/s/ **Paul A. Capua**
Paul A. Capua – NC Bar No. 40239

VPC Builders
RESIDENTIAL AND COMMERCIAL

# DESIGN CONTRACT

THIS DESIGN AGREEMENT, by and between VPC BUILDERS, LLC, a NORTH CAROLINA LIMITED LIABILITY COMPANY (hereinafter VPC BUILDERS, LLC) and Douglas S. Riordan and wife, Erin Riordan (hereinafter Owner or Owners). The parties signing the Agreement for VPC BUILDERS, LLC and Owner(s) warrant that each of them is fully authorized by their respective parties to execute and deliver the Agreement in accordance with the terms and conditions contained herein. Owner further warrants that he has authority to sign on behalf of all owners of the subject property.

FOR AND IN CONSIDERATION of the provisions undertaken and contained herein, VPC BUILDERS, LLC and Owner(s) agree as follows:

1. **Scope of the Work:** VPC BUILDERS, LLC agrees to work with the Owner(s), VPC BUILDERS, LLC's design draftsmen, and other individuals to create a set of custom design plans for the intent of construction of a house as the parties may contract and agree to build at a later date. VPC BUILDERS, LLC agrees to assist the Owner(s) in the development and preparation of a structure and agrees to consult with design rural, civil, structural, mechanical, electrical, or other systems as VPC BUILDERS, LLC deems needful or necessary. VPC BUILDERS, LLC does not include any engineering costs such as structural, civil, mechanical, electrical, etc. in their estimates unless otherwise specified. If required any engineering costs will be added onto this contract at additional costs.

2. VPC BUILDERS, LLC agrees that it will charge the Owner(s) a fee of $21,100 as an estimate of expenses for VPC BUILDERS, LLC's services related to the consultation, recommendations, advice, and other input into the proposed custom plans and design. In addition to the above amount, which represents an estimated fee to VPC BUILDERS, LLC for its work in the design process, Owner(s) agrees to reimburse VPC BUILDERS, LLC for all costs and expenses associated with design draftsmen and related engineering review as may be required for the completion of the Contract. Payment shall be due within thirty days of presentation of an invoice for reimbursement for these expenses. Costs of VPC BUILDERS, LLC's work in the design process shall include, but not be limited to: the costs of materials, cost of labor, insurance, payroll taxes of employees, transportation costs, administrative expenses, utility costs, and overhead of VPC BUILDERS, LLC related to or attributable to the project. Owner(s) agrees to be forthcoming and specific about all their needs for the design plans and shall take full responsibility for completely knowing and articulating its needs to VPC BUILDERS, LLC before VPC BUILDERS, LLC begins work on formulating design plans. In the event the Owner(s) request VPC BUILDERS, LLC to design, redesign, change, alter, amend, or add to the design plans after VPC BUILDERS, LLC has begun formulating design plans, or in the event that VPC BUILDERS, LLC, in its sole discretion, deems that Owner(s) has taken an undue amount of time in providing or specifying its needs, the Owner(s) agrees to further compensate VPC BUILDERS, LLC at the rate of $150 per hour for such work as well as to pay all costs for such work, including costs as set forth above. Such

OWNER INITIALS DR ER VPC BUILDERS, LLC. INITIALS W

request on the part of the Owner(s) for redesign, change, alteration, amendment, or addition shall be deemed accepted only upon Contractor's agreement to do such additional work.

3. Owner(s) agrees to be forthcoming and specific about all its needs for the design plans and shall take full responsibility for completely knowing and articulating its needs to VPC BUILDERS, LLC before VPC BUILDERS, LLC begins work on formulating design plans. In the event the Owner(s) request VPC BUILDERS, LLC to design, redesign, change, alter, amend, or add to the design plans after VPC BUILDERS, LLC has begun formulating design plans, the Owner(s) agrees to further compensate VPC BUILDERS, LLC at its regular rates for such work as well as to pay all costs for such work.

4. Initial Payment Owner(s) and VPC BUILDERS, LLC acknowledge that the Owner(s) will pay a non-refundable sum of 50% ($10,550), upon the execution of this contract and before design work or consultations begin as a deposit and part of the purchase price of the project as described above.

5. All designs, drawings, plans, specifications, and other documents relating to the design, construction, assemblage, and installation of the work, including, without limitation, any patents or pending patents or licenses relating to same and all other documentation are Proprietary information belonging to VPC BUILDERS, LLC or its suppliers. Owner(s) shall exercise all due care to protect the confidentiality of the Proprietary Information. Should any of the Proprietary Information be used by any party without the express written authorization of VPC BUILDERS, LLC, including work which is incomplete or unfinished, or which are subsequently changed, corrected, or amended, such use is an express breach of contract and would entitle VPC BUILDERS, LLC to damages as set forth herein. Moreover, Owner(s) agrees that, in the event of such unauthorized use of the Proprietary Information, Owner(s) will indemnify, defend, and hold harmless VPC BUILDERS, LLC from any and all claims, losses, or liabilities, including attorneys' fees, related to the subsequent use of the Proprietary Information.

6. **Default and Damages:** In the event Owner(s) shall fail to pay any payment due herein, VPC BUILDERS, LLC may cease work without breach pending payment or resolution of any dispute. The parties hereto acknowledge and agree that, due to the difficulty in calculating damages from wrongful use of the Proprietary Information of VPC BUILDERS, LLC, liquidated damages are an appropriate remedy for VPC BUILDERS, LLC Specifically, the parties agree that, in the event Owner(s) employs another contractor to build a structure for Owner(s) using any part of the plans prepared by VPC BUILDERS, LLC, VPC BUILDERS, LLC shall be entitled to collect from Owner(s), as liquidated damages, an amount equal to twenty percent of the total construction cost of the project built using the designs of VPC BUILDERS, LLC. In the event of breach by Owner(s), if payment is not received within thirty days of the date of invoice, interest shall accrue on the unpaid balance at the rate of one and one half percent per month 6-2-21 (18% APR). ~~VPC BUILDERS, LLC shall also have the right to place a lien upon the real property owned by the Owner(s).~~ DELETE In the event of breach by VPC BUILDERS, LLC, Owner(s) hereby waives any claims for incidental or

OWNER INITIALS ER

VPC BUILDERS, LLC. INITIALS W

W 6.7.21

consequential damages which may be incurred by Owner(s). Owner(s) represents and warrants that he is the owner of such real property, or that he is an authorized agent of the owner of said real estate with authority to act upon the Owner's behalf. If VPC BUILDERS, LLC has to employ, hire and/or retain legal counsel to enforce this agreement and VPC BUILDERS, LLC prevails by obtaining at least half the amount they sought as damages then the Owner shall be pay VPC BUILDERS, LLC's reasonable attorney's fees.

7. VPC BUILDERS, LLC shall not be liable to Owner(s) for any acts or omissions of any engineer who shall review the plans and design specifications contemplated by this contract. The parties specifically agree that VPC BUILDERS, LLC shall not be liable for the negligence of any engineer in the design, approval, review, or other failure which has been approved by a licensed engineer.

8. The obligations of either party under this Agreement that are of a continuing nature shall survive termination of this Agreement or final completion of the Project, unless otherwise explicitly agreed to in writing.

9. Venue: This Agreement is entered into in Watauga County, North Carolina and shall be construed in accordance with the laws of the State of North Carolina. The parties hereby agree that Watauga County, North Carolina is an appropriate venue for the resolution of any disputes arising as a result of this contract.

10. Assignment: Owner(s) may not assign, directly or indirectly, all or part of its rights or obligations under this Agreement except by mutual agreement and with written consent of all parties to this Agreement.

11. Integration: This agreement represents the entire and integrated agreement of the parties and supersedes all prior negotiations, representations, or agreements, either written or oral. This agreement may be amended by a written document duly executed by all parties. If any provision of this contract is unenforceable, invalid, or illegal, the remaining provisions will continue in full force and effect.

12. The parties agree that both Owner and VPC BUILDERS, LLC have had the opportunity to review and have had input into the terms and conditions of this contract, and that such terms reflect the agreement of the parties including the price term set forth. As a result of the integrated terms of this Agreement, including the cost of construction, both parties agree that this contract shall not be construed against either party as draftsman.

OWNER INITIALS [handwritten initials]

VPC BUILDERS, LLC. INITIALS [handwritten initials]

VPC | Builders
RESIDENTIAL AND COMMERCIAL

DESIGN CONTRACT

Dated, signed, and executed by VPC BUILDERS, LLC. on this, the 7th day of June, 2021.

BY: ______________________

Matthew T. Vincent, Licensed General Contractor,
Member/Manager, VPC BUILDERS, LLC

Dated, signed, and executed by Owner on this, the 2 day of JUNE, 2021.

OWNER(S): ______________________

Erin Riordan

Exhibit A

VPC Builders
RESIDENTIAL AND COMMERCIAL

# COST PLUS CONSTRUCTION CONTRACT

**THIS AGREEMENT** and the attached general conditions, schedules, specifications, and addenda which are made part hereof, by and between **VPC BUILDERS, LLC, A NORTH CAROLINA CORPORATION,** (hereinafter VPC BUILDERS, LLC) and Douglas Riordan and Erin Riordan (hereinafter Owner or Owners). The parties signing this Agreement on behalf of VPC BUILDERS, LLC, and Owner(s) warrant that each of them is fully authorized by their respective parties to execute and deliver the Agreement in accordance with the terms and conditions set forth herein and any accompanying schedules or adopted change orders. Owner further warrants that he has authority to sign on behalf of all owners of the subject property.

AND FURTHER, whereas VPC BUILDERS, LLC is a North Carolina corporation engaged in the building and construction business; and whereas, the Owner(s) is desirous of retaining the services of VPC BUILDERS, LLC as contemplated by this Agreement, now WITNESSETH, based on the mutual covenants and considerations contained herein, the parties hereby contract as hereinafter described.

FOR AND IN CONSIDERATION of the provisions undertaken and contained herein, VPC BUILDERS, LLC. and Owner(s) agree as follows:

1. <u>Scope of the Work</u> Owner(s) agrees to purchase and VPC BUILDERS, LLC. agrees to construct a structure and fixtures attached thereto upon property located at: 3914 Shulls Mill Road, Blowing Rock, NC 28605 (hereinafter location). Additionally, VPC BUILDERS, LLC. shall furnish materials and perform work as specified by this contract, except as modified by written or oral agreement of the parties, to be performed on the referenced property. Specifically, VPC BUILDERS, LLC. agrees to perform the following work upon the property as set forth on the attached Exhibit A, subject to the scope and limitations contained herein. In the absence of such list of work to be performed under this contract, the scope of the work to be undertaken by VPC BUILDERS, LLC shall be any tasks directly or indirectly related to the construction, building, erecting, and raising of a structure upon Owners property as designated by the construction documents, building schedules, or change orders, within VPC BUILDERS, LLC agents and officers understanding of the work to be done and subject to acceptance of the project by VPC BUILDERS, LLC.

2. <u>Commencement & Substantial Completion</u> Work shall commence upon the obtainment of a building permit, or shortly thereafter. Construction time through substantial completion shall be fixed and is TBD months,

OWNERS INITIALS DR/ER                    VPC BUILDERS, LLC. INITIALS W



Case 1:25-cv-00230-MR-WCM Document 26-1 Filed 09/30/25 Page 64 of 93

not including delays and adjustments for delays caused by reason of holiday, inclement weather, accidents, labor or material shortages, additional time required for work performed pursuant change orders, or other unavoidable delays or delays beyond the control of VPC BUILDERS, LLC.

3. <u>Contract Price</u> In consideration for the material and labor above described, the Owner(s) shall pay the VPC BUILDERS, LLC all costs incurred in the construction, building, and installation as well as VPC BUILDERS, LLC costs for labor, subject to additions and deductions pursuant to oral or written change orders, plus 18 percent (%) margin upon the total cost of the work. An estimate as to when certain amounts will be due and payable is attached hereto as Exhibit B, but shall not be binding upon the VPC BUILDERS, LLC and the actual cost will be maintained by the contractor. Payment shall be due upon any amount within two weeks of demand for such payment by the VPC BUILDERS, LLC in the event the Owner(s) request VPC BUILDERS, LLC to construct, build, erect, install, or otherwise act beyond the scope of the items set forth in Paragraph 1, Owner(s) agrees to further compensate VPC BUILDERS, LLC at its regular rates for such work. Such additions shall be deemed accepted only upon Contractor's agreement to do such additional work. An estimate as to labor costs per worker are scheduled, listed, and attached hereto as Exhibit C, but shall not be binding upon VPC BUILDERS, LLC and will under no circumstances operate as a waiver or forfeiture of Contractors rights under Paragraph 17 of this Agreement. The parties specifically acknowledge that due to the mountainous terrain of this area, grading, blasting, and excavating estimates are simply estimates of work which may be encountered, and such cost may vary substantially from the estimate depending upon the actual circumstances encountered.

4. <u>Initial Payment</u> Owner(s) and VPC BUILDERS, LLC acknowledge that the Owner(s) will pay a non-refundable sum of $20,000, upon the execution of this contract and before construction begins as a deposit and part of the purchase price of the project as described above in Paragraph 1 and further detailed in Exhibit A.

5. <u>Progress Payments</u> of the Contract price, including periodic payments to be made at certain stages in the construction process, shall be paid according to the payment schedule. Material, subcontractor costs, and labor bills shall be billed and paid pursuant to the payment schedule as agreed upon by the parties. Change orders may affect a particular payment under the

payment schedule, however. Specifically, any change in cost effectuated by a change order will be applied as calculated to the next immediate payment under the payment schedule. In the absence of a payment schedule, Owner(s) agrees to make payments as cost is incurred when a bill is tendered. Nothing contained herein shall prohibit VPC BUILDERS, LLC from making request for payment as often as deemed necessary by VPC BUILDERS, LLC.

6. Change Orders Owner(s) and VPC BUILDERS, LLC acknowledge that change orders may be necessary to accomplish the construction of the structure as contemplated under this Agreement. Under such circumstances as a change order is deemed necessary by the parties, said change order may be made verbally or in writing. Proposals for changes in the work must be delivered to the VPC BUILDERS, LLC. in charge of this construction project as detailed under this Agreement. Proposals for changes in the work provided only to the construction foreman will not be deemed delivered. Owner(s) acknowledge that change orders that are executed will affect the overall cost of the project and will modify and change any fixed price or estimates contained in Paragraph 3 of this contract. VPC BUILDERS, LLC. is the only party authorized to approve a change order under the agreement.

7. Time is of the Essence The parties agree that time is of the essence in the completion of construction described in this contract.

8. Insurance VPC BUILDERS, LLC will keep in force a Builders Risk Insurance Policy on the property as a means of protecting both Owner(s)' and VPC BUILDERS, LLC's interests until the completion of construction. The Builders Risk Insurance Policy shall be for the full Contract Price of this project, with project being defined as the value of the improvements set forth in the scope of work and not necessarily the value of the Owner(s) entire property, if the project is only a remodel, as protection against fire, vandalism, malicious mischief, or other forms of property damage that may occur. Any Insurance Policy will name the Owner as an additional insured. The Contractor shall provide a copy of any Policies to the Owner.

9. Vendors Owner(s) may only source materials and appliances from approved VPC BUILDERS, LLC Vendors.

10. Subcontractors Contractor may at its discretion engage subcontractors as may be necessary to perform under said agreement. Owner agrees to have no contact with any subcontractors except and unless with the express written permission of Contractor.

11. Retainage Upon the attainment of substantial completion in the construction process, Owner(s) may exercise the option to conduct a final walk-through with the Contractor of the substantially completed structure. In the event of such final walk-through is requested and subject at all times to the obligations and restrictions of Paragraph 11 of this Agreement, Owner agrees to be accompanied by VPC BUILDERS, LLC. General Contractor in said walk-through. During the walk-through pre-final inspection, the parties may agree to and create a punch list, a listing of final tasks to be completed to conform the structure to construction and design documents. The failure to include any item on the punch list does not relieve the contractor of his responsibility to complete the construction in accordance with this Agreement. Owner may not, however, use the pre-final inspection or any punch list to substantially or materially alter the original design or the major items of construction completed thus far in furtherance of such original design or plan. Notwithstanding the foregoing, the occupancy of the premises by the Owner or the issuance of a certificate of occupancy by the appropriate building inspector shall conclusively be deemed acceptance of the work performed by VPC BUILDERS, LLC.

12. Hindrance As structures in the process of construction may be dangerous in their unfinished condition, Owner(s) shall agree to refrain from any activities the performance of which would tend to hinder VPC BUILDERS, LLC, its agents, or employees in erecting the contemplated structure. This covenant is made in the interest of protecting persons from injury and ensuring that VPC BUILDERS, LLC is not stymied or impeded in its objectives. Inasmuch as the Owner(s) may wish to continue with regularly-conducted activity in and around the property and desires to assist with the labor of construction, VPC BUILDERS, LLC advises Owner(s), and Owner agrees, to remain as clear as possible from the areas in and around the construction by VPC BUILDERS, LLC., unless instructed otherwise by the general contractor. Although the property remains the sole and exclusive property of the Owner, Owner agrees that while this construction agreement is in effect, Owner may not enter the construction site except with VPC BUILDERS, LLC written permission or unless accompanied by VPC BUILDERS, LLC, General Contractor.

13. Parking Owner agrees to provide adequate parking for VPC BUILDERS, LLC. vehicles and all access as necessitated by the nature of the construction work to be performed in the course of the project. Parking for construction vehicles, trucks and other equipment of VPC BUILDERS, LLC shall be accommodated by Owner, except and unless parties agree otherwise to an alternate arrangement. For all access to the work location preceding, during, and after

the project.

14. Construction Utilities Owner agrees to provide and pay for all power and water required by the project, as well as any temporary facilities required in the absence of such utilities at the jobsite in order to deliver such utility services from an existing location to the points of intended use.

15. Acknowledgements Owner acknowledges that due to the inherent qualities of natural building supplies, VPC BUILDERS, LLC cannot guarantee a particular pattern or specific coloration for any custom products. VPC BUILDERS, LLC can neither guarantee a certain part, piece of hardware, type of equipment, style or design of material will be available at any given time. Owner also acknowledges that VPC BUILDERS, LLC may encounter delays from suppliers which are beyond its control, and that some jobs may experience periods of delays. Owner represents and warrants that since his or her purchase of the property, the premises has not been used for the manufacture or storage of dangerous chemicals, the presence of which would pose a health threat, however minimal, to the employees of VPC BUILDERS, LLC Owner affirmatively states that there are no items of machinery or storage tanks on the premises which would emit noxious or combustible gases, including carbon monoxide, nitrogen dioxide, or any other poisonous chemical compound.

16. Force Majeure VPC BUILDERS, LLC shall not be liable for any delay due to circumstances beyond its control or force majeure, including unnatural act or public enemy, or by labor dispute or trouble, strike, riot, vandalism, sabotage, expropriation or appropriation, flood, war (whether declared or undeclared), accident when not caused by VPC BUILDERS, LLC., storm, explosion, breakdown of machinery, fuel shortage, power shortage, railroad embargo or congestion, government regulation or action, embargo or intervention, failure or delay of manufacturers or persons from whom VPC BUILDERS, LLC is obtaining machinery, equipment, materials, or supplies to deliver the same, or other cause beyond its control, whether such other cause be of the classes herein specifically provided for or not, and whether the cause is or is not existing on the date of this Agreement.

17. Liens Contractor is obligated to remove any mechanic's lien filed against the project or Property within 2 months, after payment in full to the Contractor. Owner is authorized to discharge any mechanic's lien not timely removed and charge back to the Contractor all associated costs, including legal costs.

OWNERS INITIALS ___ / ER ___ VPC BUILDERS, LLC. INITIALS ___

18. Warranty VPC BUILDERS, LLC warrants, for a period of one year, that all work shall meet or exceed the requirements of the North Carolina Building Code. Other than this warranty, VPC BUILDERS, LLC makes no express warranties and no warranties of fitness for a particular purpose herein or within any other clause of this Agreement.

19. Default & Damages In the event Owner shall fail to pay any payment due herein, VPC BUILDERS, LLC may cease work without breach pending payment or resolution of any dispute. Specifically, should Owner fail to pay any monies due or to become due hereunder or should Owner fail to comply with any of its other obligations under this Agreement within fifteen (15) days from the mailing to Owner of notice of such default, VPC BUILDERS, LLC shall have the right, at its option to terminate the Agreement in which event there shall be due to VPC BUILDERS, LLC, as liquidated damages, a sum equal to the amount of one-half of the amount of one-phase of the project, or one-eighth (1/8) of the total project, whichever is greater. VPC BUILDERS, LLC may elect instead to accelerate all monies due for the unexpired remaining term of the within Agreement and to declare the same immediately due and payable. The parties hereto acknowledge and agree that, due to the difficulty in calculating lost profits and damages to the Contractor in the event of breach by the Owner, liquidated damages are an appropriate remedy for Contractor. In the alternative, and if neither liquidated damages or acceleration options are chosen in the event of breach, VPC BUILDERS, LLC reserves the right to sue for monies due under this contract in intervals or as the same accrue. If payment of any bill is not received within thirty (30) days of the date of the bill, interest shall accrue on the unpaid balance at the rate of one and one-half percent per month (18% APR). VPC BUILDERS, LLC shall also have the right to place a lien upon any real property where such products are installed as fixtures.

20. Rejection and Correction of Work The Owner may reject work that does not conform to the Contract and may require inspection or testing of the work. If the Contract references a standard for performance or quality of the work, failure to meet the standard shall be considered to be non-conforming work. The Contractor shall promptly correct work rejected by the Owner as failing to conform to the requirements of the Contract. The Contractor shall bear the cost of correcting such rejected work, including the costs of uncovering, replacement, and additional testing. In addition to the Contractor's other obligations, including warranties under the Contract, the Contractor shall, for a period of one year after Completion, correct work not conforming to the requirements of the Contract.

OWNERS INITIALS ED/ER    VPC BUILDERS, LLC. INITIALS W

21. <u>Cure of Default & Enforcement</u> If Owner has commenced by reasonable means to cure any default not curable in fifteen (15) days, such additional time as is reasonably necessary to cure such default may be granted to Owner before Owner is adjudged in default hereunder. Contractor's failure to strictly and promptly enforce these conditions shall not operate as a waiver of Contractor rights hereunder. Contractor hereby reserves the right to enforce prompt payment of fees or other charges, or to declare the Contract breached regardless of any indulgences, or extensions previously granted to Owner. In the event Owner defaults in the performance of any of the terms, covenants, agreements, or conditions provided herein and VPC BUILDERS, LLC refers to its attorney the enforcement of this Agreement, or any part hereof, for the collection of any monies due or to become due hereunder.

22. <u>Adequate Assurance</u> In the event of the Owner repudiates this agreement or special circumstances, VPC BUILDERS, LLC shall have the right to obtain adequate assurances from Owner regarding payment for work provided, including installment payments in the discretion of VPC BUILDERS, LLC. Owner agrees and understands that if VPC BUILDERS, LLC does not receive such adequate assurances, VPC BUILDERS, LLC shall be allowed to cease further work until assurances satisfactory to VPC BUILDERS, LLC. are received. In the such event, Owner shall remain responsible to VPC BUILDERS, LLC. for the work as performed and any other sums payable pursuant to Paragraph 17 of this Agreement.

23. <u>Bankruptcy</u> If voluntary bankruptcy proceedings are instituted by Owner or if Owner is adjudicated a bankrupt insolvent, or if Owner makes an assignment for the benefit of its creditors, or if execution is issued against Owner, or if the interest of Owner hereunder passes by operation of law to any person other that Owner then, in any of such events, VPC BUILDERS, LLC may, at its discretion declare the Agreement breached by notice mailed by certified mail and addressed to Owner at its last known address, provided that VPC BUILDERS, LLC shall retain its lien and rights as to interest in the property, however situated, for any monies or payments due or to become due to VPC BUILDERS, LLC pursuant to this Agreement.

24. <u>Impracticability</u> It is stipulated that the estimates specified herein or in the attached schedules are based upon VPC BUILDERS, LLC cost of operation and construction necessary to comply with governmental laws, rules and regulations as presently enforced. If during the term of this Agreement, there should occur a change in policy affecting enforcement of said laws, rules

and regulations, whether federal, state, or of local character, or if VPC BUILDERS, LLC should incur significant additional costs in continuing to comply with such regulations, VPC BUILDERS, LLC may advise Owner of any increase in costs resulting therefrom, in which event the charges shall be adjusted to compensate VPC BUILDERS, LLC for such increased costs. In such event of increased cost of such regulations or compliance therewith, Owner will be given the option to accept such charges or to terminate the foregoing Agreement. Should such be the case, each party hereto shall be discharged of any further liability hereunder.

25. **Indemnification** Owner shall defend, indemnify, and hold harmless for any injury or damage to VPC BUILDERS, LLC caused by errors or omissions of surveyors, inspectors, non-associated contractors or subcontractors, individuals designated by the Owner to act on Owner behalf on any phase within the Agreement, or other third parties. Owner shall indemnify, defend, and hold VPC BUILDERS, LLC harmless against all any and all claims of injury or damages brought by Owner's surveyors, inspectors, or other individuals/companies designated by Owner to perform work on the property upon which VPC BUILDERS, LLC is constructing a structure or building. Contractor agrees to indemnify the Owner and design professional for claims from bodily injury and property damage, other than to the work itself and property insured, including reasonable attorneys' fees and costs, that may arise from the performance of work but only to the extent caused by the negligent or intentionally wrongful conduct, of the Contractor, subcontractors or anybody employed by it or for whom it may be liable. This indemnification shall not in any way limit the insurance provided under this contract.

26. **Bailments & Storage** In the event any items of Owner are placed in a storage location so that construction of the structure as contemplated by this Agreement may be accomplished, Owner authorizes VPC BUILDERS, LLC. to place items in storage at the premises as needed for the completion of the construction. Such relocation, if deemed necessary, is performed as a courtesy to the Owner to mitigate damage to personal property in the construction process and is neither intended to create a situation of bailment nor a bailor-bailee relationship between the parties to this agreement.

27. **Financial Inquiry** Owner(s) consent for VPC BUILDERS, LLC to inquire into the Owner financial background for the purpose of assurance of solvency and Owner ability to pay for the initial payment as contemplated under Paragraph 4 of this Agreement, any periodic or

phase payment under Paragraph 5 of this Agreement, or any increase in cost due to a proposed change in work or approved change order made pursuant to Paragraph 6 of this Agreement. VPC BUILDERS, LLC may not inquire into Owner financial background or status for any other reason.

28. Occupancy Owner shall not occupy the property until final payment has been received by VPC BUILDERS, LLC. Occupancy under this paragraph shall constitute unconditional acceptance of the project and a waiver of any defects or uncompleted construction. In the event that VPC BUILDERS, LLC allows owner to move any furniture or personal property into the completed structure, such permission shall not act as a waiver of VPC BUILDERS, LLC right to receive any outstanding payment under the terms of payment of this Agreement.

29. Venue This Agreement is entered into in Watauga County, North Carolina, and shall be construed in accordance with the laws of the State of North Carolina. The parties hereby agree that Watauga County, North Carolina is an appropriate venue for the resolution of any disputes arising as a result of this contract.

30. Assignment Owner may not assign, directly or indirectly, all or part of its rights or obligations under this Agreement except by mutual agreement and with written consent of all parties to this Agreement.

31. Integration This agreement represents the entire and integrated agreement of the parties and supersedes all prior negotiations, representations, or agreements, either written or oral. This agreement may only be amended by a written document duly executed by all parties. If any provision of this contract is unenforceable, invalid, or illegal, the remaining provisions will continue in full force and effect. The parties agree that both Owner and VPC BUILDERS, LLC have had the opportunity to review and have had input into the terms and conditions of this contract, and that such terms reflect the agreement of the parties including the price term set forth. As a result of the integrated terms of this Agreement, including the cost of construction, both parties agree that this contract shall not be construed against either party as draftsman.

32. Portfolio Owner agrees that VPC BUILDERS, LLC may take pictures of the property and structure as constructed by VPC BUILDERS, LLC during construction and upon the conclusion of the work for the purposes of marketing and as part of the portfolio of work performed by VPC BUILDERS, LLC. All such pictures and reproductions shall be the sole property of VPC BUILDERS, LLC and may be used by VPC BUILDERS, LLC, its successors, or assigns, for such purposes as it deems appropriate without compensation to the Owner. VPC Builders,

LLC will not disclose owner's name or address in any advertising or promotions.

33. **Modifications** This contract can only be modified by the parties if the modification is in writing and acknowledged in writing by both the parties OR in conjunction with the procedure set forth in Paragraph 6 entitled Change Orders.

Dated, signed, and executed by VPC BUILDERS, LLC. on this, the 27th day of April, 2022.

BY: ______________________

Matthew T. Vincent

Member/Manager, VPC BUILDERS, LLC

Dated, signed, and executed by Owner(s) on this, the_______day of______________________, 2022.

OWNER(S): ______________________

______________________

***FINAL PAGE OF AGREEMENT***

(EXCEPT EXHIBITS A, B, & C ATTACHED HERETO)

VPC | Builders
RESIDENTIAL AND COMMERCIAL

# EXHIBIT A: WORK TO BE PERFORMED

PROJECT: Riordan LOCATION: 3914 Shulls Mill Road, Blowing Rock, NC 28605

BUILDING/STRUCTURE: Residential

TYPE: Stick Built

WORK SPECIFICATIONS/MATERIALS TO BE USED:

TBD

ANY ADDITIONAL DOCUMENTS THAT WOULD AID IN THE IDENTIFICATION OF THE PROPERTY TO BE CLEANED AND/OR RESTORED, OR ANY DOCUMENTS WHICH WOULD FURTHER DESCRIBE THE WORK TO BE PERFORMED, PLEASE ATTACH HERETO TO BE INITIALED BY BOTH PARTIES.

OWNER'S INITIALS ______ 1 VPC BUILDERS, LLC. INITIALS ______

Exhibit A

VPC | Builders
RESIDENTIAL AND COMMERCIAL

# EXHIBIT B: ESTIMATED PAYMENT SCHEDULE

PROJECT: Riordan LOCATION: 3914 Shulls Mill Road, Blowing Rock, NC 28605

PAYMENT SCHEDULE:

PHASE 1 $20,000____________________
PAYMENT DUE ON: JAN/FEB/MAR/APR/MAY/JUN/JUL/AUG/SEP/OCT/NOV/DEC, ____,
2022____. NOTES: Deposit

PHASE TBD________: $____________________
PAYMENT DUE ON: JAN/FEB/MAR/APR/MAY/JUN/JUL/AUG/SEP/OCT/NOV/DEC, ____,
20____. NOTES:____________________

PHASE TBD________: $____________________
PAYMENT DUE ON: JAN/FEB/MAR/APR/MAY/JUN/JUL/AUG/SEP/OCT/NOV/DEC, ____,
20____. NOTES:____________________

PHASE TBD________: $____________________
PAYMENT DUE ON: JAN/FEB/MAR/APR/MAY/JUN/JUL/AUG/SEP/OCT/NOV/DEC, ____,
20____. NOTES:____________________

PHASE TBD________: $____________________
PAYMENT DUE ON: JAN/FEB/MAR/APR/MAY/JUN/JUL/AUG/SEP/OCT/NOV/DEC, ____,
20____. NOTES:____________________

OTHER ARRANGEMENTS____________________

# EXHIBIT C: WORK TO BE PERFORMED



OWNER'S INITIALS EJR/ER VPC BUILDERS, LLC. INITIALS W

Exhibit A

VPC Builders
RESIDENTIAL AND COMMERCIAL

PROJECT: Riordan LOCATION: 3914 Shulls Mill Road, Blowing Rock, NC 28605

| LABORER OR WORKER: | STANDARD RATE OF COMPENSATION: | |
|---|---|---|
| 1.Matt Vincent | $90 | PER Hour |
| 2.Project Manager | $65 | PER Hour |
| 3.Superintendent | $55 | PER Hour |
| 4.Laborer | $45 | PER Hour |
| 5.Interior Design Services | $180 | PER Hour |

ANTICIPATED SUBCONTRACTORS

SUGGESTED/REQUESTED/AGREED UPON SUB

| | | |
|---|---|---|
| BRICK MASON/STONE MASON | Y/N | TBD |
| PLUMBING SUBCONTRACTOR | Y/N | TBD |
| ELECTRICAL SUBCONTRACTOR | Y/N | TBD |
| GRADING/PAVING | Y/N | TBD |
| LANDSCAPING | Y/N | TBD |
| CARPENTRY/SPECIALIZED | Y/N | TBD |
| WOODWORKING | Y/N | TBD |
| HARDWOOD/TILE/SPECIALIZED | Y/N | TBD |
| FLOORING | Y/N | TBD |
| SEPTIC INSTALLATION | Y/N | TBD |
| SITE WORK/IRRIGATION | Y/N | TBD |
| OTHER: ______ | Y/N | TBD |



OWNER'S INITIALS EV/ER VPC BUILDERS, LLC. INITIALS ______

**From:** Douglas Riordan <patriots-dr@live.com>
**Sent:** Friday, April 26, 2024 12:11 PM
**To:** Matt Vincent <mvincent@vpcbuilders.com>
**Cc:** Dayne Cook <dcook@vpcbuilders.com>; Cody Harris <charris@vpcbuilders.com>
**Subject:** RE: Riordan Residence: Panel Door Engineering Update

Matt,

I've taken a moment to reflect on the most recent emails from Dayne on April 16 and April 25 and the position that VPC has taken concerning the sliding glass door. I am hopeful that this issue can be resolved with little trouble, but I would like to address a few points in your email that I disagree with and provide some broader context to all this.

Although we are now addressing the sliding doors, this project has suffered from engineering and design errors that have caused delay and additional costs at various stages. For example, the construction of the stairs descending from the front entrance leading into a doorway was an oversight by VPC that resulted in the entire set of stairs needing to be redone. VPC's failure to include proper support for the roof required additional time and money that should never have been needed. The drawing by VPC for the rear deck staircase was not designed to code nor properly designed to fit. It wasn't until I asked why the stairs we're not built yet and why the footer for them was in the wrong location did I discover that there was a problem. I took it upon myself to design an alternative staircase as a result. Both

dormer roofs were designed inaccurately so that neither the shed roof nor the dormer window have enough room as drawn. Now, the clashing and unsightly issues with the sliding door (and the excuse that this was approved by me) is yet another in a series of errors that has left me frustrated and questioning VPC's commitment to this project.

Addressing Dayne's most recent emails concerning the sliding doors and expectation that I pay for it, the information is inaccurate and needs to be corrected. The original plan for the sliders was to house them within the interior of the walls of the home, hidden from view. After construction was underway, however, I was approached by Carson and Chris and told that it would create additional space and be more aesthetically pleasing for the sliders to be housed on the outside of the home. These were the *only* reasons I was told the sliders should be moved and I agreed to move them for these reasons alone. I also was told that this approach would require additional construction and cost, which I paid.

After Daryl replaced Chris, Daryl explained that the sliders could not be housed on the outside of the home and that they needed to be moved back to their original position. Because I had already approved that position and did not necessarily require the additional space, I agreed to Daryl's recommendation to install the sliders as originally planned. However, Daryl proceeded to install the sliders further inward than called for on the plans, which does not allow adequate access between the sliders and the fireplace and is truly unsightly.

I have since discovered that the sliders could *not* have been constructed in their as-planned location because it clashed with a structural support post located where the interior housing for the sliders was designed to go. This of course is the real reason Carson and Chris initially asked me to move the sliders to the outside and not because it would create more space or look better. We could have easily worked through this condition with transparency, but now I am frustrated because it feels like VPC was hoping to resolve this issue without disclosing another design error. To claim that I "approved" these drawings from the drawing titled "sliding door detail" because you included them in Builder Trend with dozens of other uploaded files is even more upsetting. This drawing was never discussed, and I never provided VPC with approval of the drawings.

It is now almost two years since the construction contract was signed, and my home has yet to be dried in. The repeated design failures by VPC have cost me additional time and money. While I would like to resolve this issue quickly and amicably, my tolerance for the ongoing problems and VPC's apparent lack of commitment to completing this project is wearing thin.

Over a month ago I had proposed extending the structural support post out to avoid clashing with the sliders and did not believe this would have required

reengineering. Because VPC was unwilling to make any changes without approval by an engineer, I proposed that VPC contact Arete and urge them to promptly inspect the home and approve drawings for the proposed new location of the support post. It has been more than four weeks since these discussions and only yesterday did Dayne respond stating that Arete would take an additional three weeks to do this task and at a further cost me. Based on the drawings, however, it should be a brief visit by Arete to approve the new location for the support post. Also, I am not willing to pay for these changes as they were unapproved errors by VPC.

If Arete is unable to approve revised drawings sooner, then I would suggest VPC contact another qualified engineer to approve them. The framing for this house needs to be completed and the house dried in without further delay.

My notice of non-conforming work, pursuant to Paragraph 20 of the agreement, stands unchanged. VPC must "promptly correct work rejected by the Owner as failing to conform to the requirements of the Contract" and "shall bear the cost of correcting such rejected work, including the costs of uncovering, replacement, and additional testing."

While I am frustrated with events that brought us to this point, I don't wish to see our relationship end, and you should view this email as nothing more than a constructive effort by me to help get this project back on track and completed without further delay, engineering or otherwise. (I also draw your attention to the "Time is of the Essence" clause included as Paragraph 7 of the agreement). I believe the sliding door issue should be remedied promptly and at VPC's expense.

Again, my goal is to focus on constructive solutions to getting the house dried in and completed properly without further delay. Please let me know what your plans are for accomplishing these objectives.

Thank you,

Doug Riordan

---

**From:** Dayne Cook <dcook@vpcbuilders.com>
**Sent:** Thursday, April 25, 2024 8:22 AM
**To:** Douglas Riordan <patriots-dr@live.com>
**Subject:** Riordan Residence: Panel Door Engineering Update

Doug,

I know I had mentioned in my previous emails that we would provide a cost for moving forward. We have heard back from the engineers on the cost and the timeline for working on the change to the structure on your home to accommodate for the multi-slide doors. The total cost would be $1,486 and the engineers have agreed to push this to the top of their list and complete the

design in roughly 3 weeks if it is approved this week. Let me know if you would like to move forward with this and I will write up a change order.

VPC Builders

DAYNE COOK
Project Manager
O| 828.295.0707
VPCBuilders.com

**From:** Douglas Riordan <patriots-dr@live.com>
**Sent:** Friday, August 2, 2024 2:52 PM
**To:** Matt Vincent <mvincent@vpcbuilders.com>
**Cc:** Dayne Cook <dcook@vpcbuilders.com>
**Subject:** Riordan Residence Change Order 32

Matt,

This email concerns Change Orders 22 and 32 and my current position on the great room window wall. I've explained my position on this before including in my emails dated April 26 and May 8, 2024, and our meeting on May 15, 2024. I don't want to rehash all that again, except to make clear where I currently stand with the delays and costs related to this project and the window wall. In short, my position hasn't changed.

I believe the delays and extra costs VPC is charging me for the reengineering and reconstruction of the window wall amount to breaches of the design and construction contract. As a result, I dispute that portion charged to Change Order 22 related to Arete's redesign charges ($1,180.00), and the entirety of Change Order 32 for $50,268.00. It is incredibly disappointing that VPC is unwilling to acknowledge responsibility for its mistakes and is charging me for those mistakes and non-conforming work.

As bad as that is, I cannot afford further delay and disruption to this project. Therefore, I am willing to fund the Arete redesign charge of $1,180 applied to Change Order 22 in its entirety and approve Change Order 32 on the following conditions: i) that there will be no further charges related to relocating or modifying the window wall to its original location whatsoever (including engineering or construction labor or materials or general conditions); ii) that I am reserving all my legal rights related to the matters summarized in my emails and the window wall including my rights to dispute the change orders, the delays associated with them, and to recover the payments being made; and iii) that VPC understands that I am making the payments under protest and intending to reserve all my rights.

It should also go without saying that we are well into the third year of our construction contract on a relatively simple build and time remains of the essence in completing this project.

As soon as you confirm your agreement to these conditions, I will release the payment on Change Order 22 and approve Change Order 32.

Regards,

Doug Riordan

---

**From:** Dayne Cook <dcook@vpcbuilders.com>
**Sent:** Wednesday, July 31, 2024 12:18 PM
**To:** Douglas Riordan <patriots-dr@live.com>
**Subject:** RE: Riordan Residence: 7.26.24 Update

Doug,

I wanted to follow up with you and see if you had received the change order information for the Great Room wall.

Let me know if you have any questions.

Thank you,

DAYNE COOK
Project Manager
O| 828.295.0707
VPCBuilders.com

---

**From:** Dayne Cook
**Sent:** Friday, July 26, 2024 3:39 PM
**To:** Douglas Riordan <patriots-dr@live.com>
**Cc:** Cody Harris <charris@vpcbuilders.com>
**Subject:** Riordan Residence: 7.26.24 Update

Doug,

I wanted to take a moment to provide you with an update on your home project.

**Update:**

1. We passed rough-in inspections this week and will now be transitioning into insulation soon.
   a. The inspector has asked for a few small items to be completed and to send him photos when completed which will be early next week.

**Follow Up:**

**I will be releasing the change order information for the Great Room Window wall for your review today.**

Let me know if you have any questions.

Thank you,

DAYNE COOK
Project Manager
O| 828.295.0707
VPCBuilders.com

Exhibit C

**Change Order**

Printed: Jul 26, 2024
2059 Tynecastle Highway, Banner Elk, NC 28604
Phone: 828.295.0707
Fax: 828.832.3882

**Owner Info**

Doug Riordan (New Construction)
3916 Shulls Mill Road
Blowing Rock, NC 28605
Phone: 561-722-8802
Cell: 954-609-4172

**Job Info**

3916 Shulls Mills Rd
Blowing Rock, NC 28605

| Change Order ID |
|---|
| 0032 |

| CO ID | Created / Approved Date | | Price |
|---|---|---|---|
| 0032 | Created:<br>Pending... | Jul 16, 2024 | $50,268.00 |

| Description |
|---|
| Great Room Window Wall Modification<br>Change Order 32 is to address the modification of the Great Room Window Wall to adjust panel door system location based on updated Gable Wall Engineering Drawings from Arete Engineering dated 07.03.24. Modifications include, but are not limited to the following:<br>-Rough framing demolition, removal and disposal.<br>-Existing Steel Frame dismantling, removal and disposal.<br>-Temporary Framing to support the existing structure affected by the removal of the existing framing.<br>-New Steel material, fabrication and installation labor.<br>- Delivery of steel to the jobsite.<br>-Steel installation Labor.<br>-New rough framing materials and installation labor for modified exterior window wall, new built up stud columns as required below new steel framing, sheathing.<br>- VPC General Conditions. |

Exhibit C

Please note that approval of this change order is estimated to add 30 days to the overall project schedule.

| Items | Description | Qty / Unit | Unit Price | Price |
|---|---|---|---|---|
| 05 02 01 - Structural Steel Framing | -New Steel material, fabrication and installation labor. | 1 | $29,500.00 | $29,500.00 |
| Labor<br>06 02 03 - Rough Framing | Labor only to remove some existing framing including steel, install temporary framing, new built-up stud framing as might be required, reframe/infill frame as required, new framing on exterior all the way to underside of deck roof, replace/repair sheathing/building wrap/rainscreen as required. | 1 | $13,216.00 | $13,216.00 |
| Materials<br>06 02 03 - Rough Framing | Rough Framing Materials as required to complete exterior wall envelope of the house. Wood Framing members, sheathing, fasteners, etc. | 1 | $1,770.00 | $1,770.00 |
| 01 13 12 - General Conditions | | 1 | $5,782.00 | $5,782.00 |

| Status | Signature | Date |
|---|---|---|
| Approved by: __________________ | | ___/___/_____ |

| Approval Comments |
|---|
| |

I confirm that my action here represents my electronic signature and is binding.

TOTAL AMOUNT OF CHANGE ORDER: $50,268.00

Exhibit D

**From:** Douglas Riordan <patriots-dr@live.com>
**Sent:** Monday, June 30, 2025 3:47 PM
**To:** Dayne Cook <dcook@vpcbuilders.com>
**Subject:** Re: Riordan Residence: Postponement of Work

Dayne,

You are mistaken about the accounting, as there is no outstanding balance due and payable. I had already authorized payment on bank draw 15 (2) for $8,833.17. It was the bank that rejected that pay application because, after inspecting the progress of the work, the bank determined that VPC hadn't actually completed the work it was charging for. As you know, I've been working with you to have that paid since last Thursday. I'm also current on the design invoices, and I am still waiting for the information I requested on the general conditions charges (8516, 8585, and 8653) that are currently being disputed.

Your decision to stop work is inappropriate. I am learning that VPC is behind the 5-week delay with Jack's Glass and the shower door installation. Jack's Glass was supposed to return today to resume the installation after cracking the glass door last week, and I've been here on site waiting for Jack's Glass to return. Yet, you are now saying VPC is stopping work.

Your stop work email is unacceptable. VPC has been dragging this project out interminably and, notwithstanding, intends to delay it even further at our expense for no good reason. Please accept this as a formal notice of breach.

Regards,
Doug Riordan

---

**From:** Dayne Cook <dcook@vpcbuilders.com>
**Sent:** Monday, June 30, 2025 10:47:22 AM
**To:** Douglas Riordan <patriots-dr@live.com>
**Subject:** Riordan Residence: Postponement of Work

Exhibit D

Doug,

I hope you had a good weekend. I wanted to reach out and let you know that right now you owe a substantial amount of money that is now past due. We are going to postpone any further work until we can get caught up on payments.

Thank you for understanding.

VPC Builders

DAYNE COOK
Project Manager
O| 828.295.0707
VPCBuilders.com

July 7, 2025

Dayne:

In reference to your emails of June 30 and July 1, it is not in my interest to escalate matters, yet I trust you can understand how notifying me of VPC's decision to stop work near the end of a project on which I will have paid VPC approximately $5 million when finished would be upsetting to me. It has caused me to take a step back and take a closer look at our agreement and this project.

I disagree with the assertions in your letter including that VPC has the right to stop work. Stopping work will cause further delays and financial hardship. Your conciliatory statements notwithstanding, stopping work under the circumstances is an act of escalation.

We are therefore at an important juncture in the life of this project, and for that matter, in the life of our relationship as a whole. As a result, I think it is important that I provide some background and put some context to my response.

When my wife and I hired VPC as our design-builder to design and build our home, we did so relying on VPC's expertise as a turnkey contractor. We trusted VPC to deliver accurate and buildable house plans, cost estimates, and construction schedules. The documents that VPC prepared and finalized around July 2022, reflect a two-story, single-family residential structure containing 5,820 heated sq ft and an estimated project cost of $2,762,585. We anticipated an 18-month construction completion schedule.

The project, however, has suffered from many design, execution, and accounting errors and is now far behind schedule and over budget. Despite this relatively straightforward design-build project, VPC is now in its *fifth* year of this project and the cost has nearly doubled.

Some of the problems of which you are aware that have unnecessarily complicated this project include:

- The design and construction defects related to the great room sliding door/ window wall
- The delays associated with correcting the sliding/window wall
- The design and construction defects relating to framing the interior staircase, and resulting delays

- The failure to structurally support the roof
- Plans defects relating to the rear staircase
- Installing the footers for the rear deck stairs in the wrong location
- Design and construction defects relating to the dormer roofs (impacting the shed roof and dormer window)
- The lack of engineered plans for the jacuzzi (a code violation)
- The turnover of key project management and staff
- VPC's decision to stop work after breaching the contract and causing significant delays

And accounting errors that include, among others:

- Failing to allocate general conditions charges or providing backup documentation for such charges on request
- Charging for the costs to repair defective work and for general conditions correlating to that work
- Charging general conditions for VPC's delays
- Improperly charging a builder's fee on interior design invoices
- Overcharging for interior design work

I have addressed these and many other issues with VPC in earlier emails and I don't want to belabor that again here. Suffice it to say, in my experience the overarching deficiency that can account for all these problems occurring in such a small project is a lack of proper project oversight and coordination. That is, VPC's poor project coordination has unnecessarily driven up the costs and time to complete this project and it must accept responsibility for this reality.

I am committed to finding a mutually acceptable solution to the current situation, but VPC must understand that by definition any "mutually" acceptable solution must not only meet *VPC's* needs, but also *our* needs. To date, VPC has not been willing to compromise or accept any responsibility and instead has required us to accede to all of VPC's demands at the risk of it stopping work and scuttling the project, which threat VPC has now made good on.

Whenever I have raised concerns about delays, poor workmanship, or accounting issues VPC's response has been to side-step accountability blaming me for supposedly interfering with the project and subcontractors. Our emails of April 26 and August 2, 2024, are just two examples. When I complained to Matt about the sliding door/window wall defects on April 26 and the months-long delay during which the house was exposed to the elements – a design defect that cannot seriously be disputed – Matt disagreed and said he wanted to "bring up that I am personally

getting phone calls now from subcontractors" complaining about one thing or another. Curiously, VPC made no mention of my allegedly inappropriate behavior until *after* I complained. On August 2, when I complained about the ongoing delays and the fact that VPC was "well into the third year of our construction", VPC responded that "we now have employees that are scared to go to your project in fear of you berating them . . . ." Again, VPC did not bring these apparent concerns to my attention before I complained, and such assertions as I have already informed you are insulting and unfounded.

Despite all the challenges, I had always taken comfort in VPC's assurance that it would accelerate the schedule and be finished with construction by certain dates. The same is true for the budget – I trusted that VPC would not be charging me for all the time and costs it spent repairing or supervising its defective work. Based on recent events, I have come to realize that VPC's assurances were made to placate me at the time and that it had made no meaningful efforts to manage the schedule or costs on this project.

After more than four years and having paid all VPC's invoices timely, one would expect that with a long-term view of things VPC would have made more of an effort to understand my concerns before taking drastic measures.

VPC insisted on charging us for the sliding door/window wall repair costs (more than $52K) despite a contractual requirement making VPC clearly responsible for such costs. VPC refers to these charges as "Change Order 32", but charging an owner for correcting contractor mistakes is not a proper change order.

VPC originally agreed to a completion date of December 2023. My family and I moved to North Carolina in June 2023 into our small cabin on our property in reliance on this date, a cabin we intended to rent, not live in. After VPC revised its completion date to June 2024 and we observed more delays and realized VPC was nowhere close to meeting this deadline, I requested a meeting to discuss VCP's delays. That meeting occurred in May 2024 and VPC agreed to accelerate the schedule. VPC updated the schedule in Buildertrend (BT) to reflect a completion date of November 25, 2024. Based on these assurances, we released the disputed sliding door/window wall payment while informing VPC we intended to reserve our rights to dispute these payments at a later date.

After, VPC behaved as if that meeting and our agreement as to the completion date never took place. Two months after that meeting VPC made no demonstrative progress on the sliding door/window wall. In the meantime, the project stagnated while the house remained exposed to the elements. VPC then

unilaterally changed the completion date to cover for more of its delays. When VPC realized that its failure to order cabinets would cause a 4-month delay, VPC changed the post-completion meeting from January 1, 2025 (based on the November 25 completion date) to April 10, 2025. Afterwards VPC sent a "change order" purporting to extend the schedule another 65 days for its failure to order the cabinets. On November 1, 2024, I said:

> After meeting with Matt in May of this year, we had a completion date in BT of December 2024. Since then, the schedule has been inexplicably extended in BT to April 2025 as of today. With the cabinet CO now pending, the completion date would be extended to June 2025. Every month that goes by the schedule has been increased by a month or more. We don't ever seem to be getting closer to completion.

Of course, April and June have passed and the house is still not completed. Now, it is not the cabinets that are extending the schedule, but VPC's failure to supervise Jack's Glass and complete installation of the master bath.

Meanwhile, the expected total project costs is nearly double that of the original estimate and just last week I learned that VPC has put no cost-control mechanisms in place to allocate repairs costs or general conditions to any particular line of work, meaning that VPC has invoiced my wife and I for every dollar VPC has spent without regard for its mistakes, delay, or contractual obligations.

As explained in previous emails, VPC's inclusion of charges in its invoices and general conditions to repair its mistakes and for periods of delay disregard VPC's explicit contractual obligations to bear those expenses.

VPC has also disregarded its contractual obligations by charging for extra interior design fees that were already included in the approximate $24,000 interior design commission. The contract documents for the "Interior Design Commission" includes "management of on-site install[ation]" of the furniture on delivery. Even so, in Invoice 8764 VPC is seeking to separately charge us an additional 36 hours in its management time for installing the furniture.

Similarly, VPC has incorrectly charged for, and has not even acknowledged wrongdoing in charging, an 18% markup on its design fees notwithstanding that the design contract gives VPC no right to charge a markup on design work.

I recognize we have requested changes to the scope of this project and, as a result, we have agreed to many change orders. I have never denied that. None of the issues I have addressed in this letter, or in my prior emails, have ever overlooked the additional costs and extra time those changes have had on this project.

I also recognize that it must be difficult for VPC to hear these perspectives. I do not express these points to provoke VPC into writing a response letter explaining all the reasons why it disagrees, accusing me of interfering with subcontractors, or failing to acknowledge the change orders we have requested. In fact, to avoid making this letter more difficult than it is and to maintain the constructive spirit we seek, this letter does not detail each of the instances in which we consider that VPC has not complied with its obligations.

Rather, I've explained our perspectives because we believe it is important for VPC to understand why, from our perspective, VPC's decision to stop work based on our alleged failure to pay invoices is both incorrect and a step too far.

With that by way of background, I believe it would be shortsighted for VPC not to take a step back and try to find a commercial solution to the current situation in order that the project can be completed in an orderly way. To that end, I certainly do not agree with your position that VPC is entitled to stop work on a project it has already substantially delayed in a brinksmanship-style effort to force financial concessions from an owner on legitimately disputed charges.

Given that VPC has stopped work and that I believe it is not within its rights to do so, I inform you of the following:

1) VPC is in breach of contract due to its ongoing delays and stopping work, and request is hereby made that VPC immediately resume work.
2) We dispute and are entitled to a setoff in the amount of $52,212.84 for Change Order 32.
3) We dispute and are entitled to a setoff on the general conditions charges on VPC's invoices from March through June totaling $66,571.36.
4) Invoice 8731 is disputed to the extent that it contains charges for the ERV System which is not installed.
5) We dispute all general conditions charges after June 2025
6) We dispute any charges for change order work in excess of the prices agreed on in the Change Orders.
7) We dispute and are entitled to a setoff in the amount of $6,480 for improper markup on interior design charges.

8) We dispute and are entitled to a setoff on Change Order 53 in the amount of $13,300, $4,300 of which is for repair costs and $9,000 of which is disputed because roughhewn lumber and labor was already quoted and approved in Change Order 43. Therefore, neither of these charges is our responsibility.
9) We dispute and are entitled to a setoff in the amount of $6,315.82 related to two dining room chairs and a coffee table that do not fit (the two chairs cost $5,315.82 and the coffee table was returned with a $1,000 re-stocking fee).
10) We dispute $7,998 in furniture storage fees due to contractor delays.
11) Also due to contractor delays, we are entitled to a setoff of $38,290 for interest loan expenses, $3,454 in additional builder's risk insurance fees, $10,000 in lost rental income on the cabin, and approximately $4,000 in extra rental expenses for the port-a-jon and scaffolding, for a total of approximately $56,000.

In the meantime, because VPC has stopped work and left the project unfinished, we are in the process of hiring a licensed professional engineer to inspect the work and make final recommendations, which fees and any recommendation will also be charged to VPC.

I propose that we have a meeting to discuss these and other remaining issues and a plan for moving forward. We look forward to your prompt response in the hopes that our intended spirit of constructiveness will be reciprocated.

Sincerely,

Douglas Riordan

# ASSIGNMENT OF RIGHTS

This Assignment of Rights (this "**Assignment**") is made and entered effective as of July 24, 2025 (the "**Effective Date**"), by and between Erin Riordan ("Assignor") and Douglas S. Riordan ("Assignee").

**WHEREAS**, Assignor and Assignee are married, and together are parties to three contracts (the "**Contracts**") with VPC Builders, LLC ("**VPC**"): (1) a design contract entered into on or about June 7, 2021; (2) a cost-plus construction contract entered into on or about April 27, 2022; and (3) an interior design contract entered into on or about August 22, 2022 (together, the "**Project**").

**WHEREAS**, Assignee oversaw all aspects of the Contracts on Assignor's behalf, and other than signing the Contracts with Assignee together, Assignor had no part in the negotiation of the Contracts or in overseeing their performance and, as such, Assignor's involvement in the underlying subject matter of the Contracts was minimal to non-existent.

**WHEREAS**, dispute arose with VPC in connection with the Project and in early-2025 Assignee was anticipating litigation with VPC. Around that time, Assignor was seriously injured in an accident and suffered a traumatic brain injury, which required significant medical attention, including brain surgery, and rehabilitative treatment, during which time Assignor was temporarily unable to read or write.

**WHEREAS**, In July 2025, as Assignee was preparing to file a lawsuit against VPC, Assignor agreed to assign, transfer, and convey to Assignee all of Assignor's rights, title, and interest in and to the Contracts given her health condition and lack of involvement in the Project.

**THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

Assignor hereby irrevocably assigns, transfers, and conveys to Assignee, as of the Effective Date, all of Assignor's right, title, and interest in, to, and under the Contracts, including without limitation all claims, causes of action, choses in action, demands, and rights of recovery arising therefrom (including for past, present, or future breaches), and all proceeds thereof.

IN WITNESS WHEREOF, the parties have executed this Assignment as of the Effective Date.

**ASSIGNOR**:

Name: Erin Riordan

Signature: Erin Riordan

**ASSIGNEE**:

Name: Douglas S. Riordan

Signature: ______________________